Commonwealth *v.* Ford Motor Company,
Appellant.

Argued May 24, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

reargument refused September 25, 1944.

Geo. Ross Hull, of Hull, Leiby & Metzger, with him Wm. A. Seifert, and Reed, Smith, Shaw & McClay, for appellant.

H. F. *Stambaugh,* with him *B. B. Bastian,* Deputy Attorney General, and *James H. Duff,* Attorney General, for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 30, 1944:

The appeal is from the judgment of the court below affirming the resettlement of a foreign corporation's franchise tax by the Department of Revenue.

The primary question involved is whether the formula enacted by the Act of May 16, 1935, P. L. 184, 72 PS 1871, amending the Act of June 1, 1889, P. L. 420, interpreted by this Court in *Com. v. Columbia Gas and Electric Corp.,* 336 Pa. 209, 8 A. 2d 404, was correctly applied. The second question presented is whether, if correctly applied, the provisions of the Act are constitutional.

It will suffice preliminarily to state that the Act imposes a franchise or excise tax upon foreign corporations authorized to do business in this Commonwealth, in substitution for the property or ad valorem tax theretofore payable by such corporations. In the *Columbia Gas and Electric Corp.* case, supra, the history of the legislation is discussed and the constitutionality of the Act sustained. We decided, however, that assets of such foreign corporations which were not part of the working capital, and had no relation to the value of the business carried on in this Commonwealth, should be excluded from the operation of the formula. See *Commonwealth v. The Mundy Corp.,* 346 Pa. 482, 30 A. 2d 878.

It is earnestly urged by appellant that the record reveals that there have been included in the application of the formula, tangible and intangible assets which are not part of its capital and which bear no relation to the value of the business carried on within this Commonwealth. In support of such contention we have been supplied with graphs, charts and mathematical demonstrations of almost astronomical proportions. We are therefore required to examine the facts in some detail to deter-

mine whether the statute has been correctly applied to them.

The Ford Motor Company is a corporation organized under the laws of Delaware. It is authorized by its charter to engage in a variety of business activities including the purchase, sale and holding of securities for investment or otherwise, the acquisition, management and operation of subsidiary corporations, the acquisition, ownership and granting of licenses under patents, mining, processing and dealing in coal, minerals, ores and metals, and the manufacture and sale of goods and merchandise of every description. Appellant's principal place of business is at Dearborn, Michigan. It has scattered throughout the United States a vast network of industrial and mercantile operations. It owns and operates mines of coal, iron, lead and garnet. It owns and operates quarries and timber tracts. Its manufactories produce pig iron, steel, castings, coke, benzol, gas and coal tar products. It has rolling mills, forges, die and tool shops, glass factories, paint plants, cement plants and saw mills. It operates a private railroad and a fleet of vessels plying the inland waters and the oceans.

In the State of Pennsylvania, in 1935, appellant owned and operated an assembly plant at Chester, where parts shipped from outside the State were used in the final step of manufacturing Ford automobiles. At Chester there was also a sales and service depot from which Ford automobiles and parts are sold at wholesale to dealers. At Pittsburgh there was a similar sales and service depot. In Philadelphia there was a building used for storage and the display of appellant's products. The Pennsylvania payroll of the corporation for that year was in excess of $4,625,125, the book value of its tangible assets in this State was $7,196,685, and its gross receipts assignable to Pennsylvania operations were $45,927,254. These figures were reported by appellant to the Department of Revenue and used by the taxing authorities.

As a foreign corporation doing business in this State, appellant was authorized by its Certificate of Authority

from the Commonwealth to engage here in the business of manufacturing and selling automobiles. For the privilege of doing this business, it was subject to the payment of an annual franchise tax under the Act of May 16, 1935, P. L. 184; 72 PS 1901, amending the Act of June 1, 1889, P. L. 420. Upon the basis of the company's report, the tax for 1935 was originally assessed at $106,499.91. Appellant petitioned for resettlement, and obtained a reduction of the tax to $88,470.92.

To comprehend appellant's contentions it is necessary first to refer to the purpose and operation of the Act of 1935. This Act imposes a *franchise* or *excise* tax upon foreign corporations, as distinguished from a property or ad valorem tax. Prior to 1935, foreign corporations doing business here were required to pay a capital stock tax, which, as a property tax, proved unsatisfactory and produced unfair results. As we stated in *Arrott's Estate*, 322 Pa. 367, 372, 185 A. 697, the Act of 1935, by changing the incidence of the foreign corporation tax, endeavored to achieve a more equitable measurement of taxation for this class of corporation. It accomplished this by imposing a franchise tax not *upon* capital stock but *measured by* capital stock. The tax base was determined, not by the allocation to Pennsylvania of an arbitrary percentage of the total capital stock of the corporation, but, through the use of a tripartite formula, by ascertaining, insofar as possible, the relation of the corporate activities in this State to the activities of the corporation everywhere. In the *Columbia Gas and Electric Corp.* case, supra, at page 216, we said: "The tax base represents the value of [the] right to do business in this State." This value, of course, is intangible, and incapable of *exact* computation, but, in the *Columbia Gas and Electric Corp.* case, supra, we discussed the measurement of value devised by the legislature and sustained its reasonableness.

The Act of 1935 provided that the entire capital stock of a foreign corporation, at its proper valuation, should

be divided into three equal parts. The resulting figure may be referred to, for convenience, as the multiplicand. This is first multiplied by the decimal fraction representing the ratio of tangible property in this State to tangible property of the corporation everywhere. It is then to be multiplied by a decimal fraction representing the ratio of wages paid by the corporation in this State to the total of its wage payments everywhere. Finally, it is multiplied by the decimal fraction representing the ratio of gross receipts assignable to Pennsylvania to gross receipts from all sources. The sum of these three multiplications is the tax base, representing the value of the Pennsylvania franchise, which is taxed at the rate of five mills.

In the *Columbia Gas and Electric Corp.* case, supra, we held that the tax, not being a property tax, but a tax upon the privilege of engaging in business in this Commonwealth, should be measured by a valuation reflecting capital so used as to affect the value of the Pennsylvania franchise, rather than a valuation reflecting merely aggregate capitalization. Many foreign corporations, like this appellant, are chartered to engage in a number of *unrelated* business activities or functions. Some of these diverse functions may have no relation to the business conducted in this State. We found that the Columbia Gas and Electric Corporation was engaged elsewhere in an extensive holding company business, which had no effect upon the operating business conducted by it in Pennsylvania, and, therefore, no effect upon the value of its Pennsylvania franchise. Consequently, we held that it was consistent with the legislative intention to exclude from the multiplicand of the statutory formula the value of so much of the capital stock of the corporation as was devoted to the holding company business. So reduced, the multiplicand merely reflected the value of the corporation's capital employed here, and elsewhere, in its operating function, since only by the employment of this capital was the value of the Pennsylvania franchise enhanced or affected.

A similar result was reached in *Commonwealth v. The Mundy Corp.,* supra. In that case, we directed the exclusion from the formula of the value of securities owned by the corporation, which had been purchased with shareholders' contributions and were retained solely for investment. We held that these assets were not part of the *working capital* of the corporation, and had no relation to the value of the business carried on by the corporation in this State.

Relying on these two decisions, appellant first contends that the determination of its 1935 tax is contrary to the established principles of operation of the Act of 1935. It asserts that its business is *multiform,* and that it conducts in Pennsylvania only two of four distinct corporate functions. It attempts to segregate these functions as follows: (1) the purchase and production of raw materials; (2) the manufacture of steel, glass, cement, paint, forgings, tools, dies, gauges, coke, benzol, and other products and byproducts of its raw materials, including finished automobile parts; (3) the assembly of finished automobiles, ready for sale, from pre-fabricated parts, and (4) the sale and servicing of the finished automotive products. Only the latter two functions are, it asserts, conducted in this State. Upon this premise, appellant maintains that all of the capital stock valuation representing capital employed in the first two functions should be withdrawn from the statutory formula. Thus, instead of using as the multiplicand one-third of $498,-428,150, which the court below found to be the entire value of appellant's capital stock, appellant would substitute a multiplicand of one-third of $90,396,002, which it contends is the value of that portion of the entire capital stock which is devoted to the last two functions above mentioned.

The fallacy of appellant's major premise is apparent. It appears to be extremely arbitrary to divide its manufacturing operations into three distinct and "unrelated" functions, segregating, for instance, the function of as-

sembly, which appellant concedes to be the last phase or final step in the process of manufacture, from the first and intermediate phases. The chief difficulty with appellant's premise is, however, that it is completely contrary to the evidence presented and to the findings of fact of the court below, which, being supported by the record, must be given their customary conclusive effect.

The court below found that all of the capital stock of appellant was properly included in the measurement of its franchise tax, because it was all employed by the corporation in conducting a *unitary* enterprise. The entire capital of the Ford Motor Company is devoted to the manufacture and sale of its automotive products. There is an integral coördination of its various functions from the very conception of the manufacturing process to the sale and servicing of the finished products. The fact that these functions are many and varied does not require that they be regarded, for tax purposes, if not for practical purposes, as separate and unrelated enterprises. On the contrary, it appears that appellant has drawn them together into a cohesive economic unit. Because it finances its own purchases of raw materials, thereby reducing the cost, it must preserve large resources of working capital. It produces a large percentage of these materials at its own mines, quarries and timber lands. It maintains a private system of transportation for transporting the raw materials to its mills and factories. It processes them and manufactures them into parts for its trucks and automobiles. The parts fabricated by the company are shipped to assembly plants throughout the nation, similar to the plant at Chester, Pennsylvania, where the final step in the manufacturing process takes place. By means of these plants the company is enabled more conveniently, as its witness testified, to reduce the time and cost of distribution. In the assembly plants the parts are attached to the chassis, the body is welded, the upholstery is installed, the motor is assembled, the automobile is painted and equipped with tires and acces-

sories. From Chester finished cars are shipped on order throughout Pennsylvania and many surrounding states. From the sale and servicing of the finished products the company derives its revenues. This is the consummation of the *unified* operation. The whole of the corporate capital is devoted to the manufacture and sale of the finished products. The whole enterprise is like a vast assembly line, each part of which must operate in relation to the others and in harmony with them.

The fact that appellant's structure is vast and complex does not, as we have said, obscure its unitary nature. True, as appellant contends, one or more of the phases of its complete activity might have been separated from the others and conducted apart from them. The company could, for example, cease to produce its own raw products and purchase these materials from outside sources. It might have resorted to financial institutions for loans to purchase materials, thereby reducing its working capital. It might have ended the process of manufacture short of assembly, or, as appellant suggests, limited its activities to the assembly of automobiles from finished parts fabricated by other corporations. *It did, however, none of these things.* It has preferred to establish a great, cohesive empire of industry, through which it may control every phase and every step of the manufacture and sale of its products.

The tremendous advantage which has accrued to appellant by this integration of activities is manifest. The cost of the products in Pennsylvania has been affected by the economies possible in such a *unitary* structure. The demand for them has been affected by the goodwill of the large single enterprise, its centralized advertising possibilities, and its financial stability. Each one of the diversified activities of the corporation, representing together the full play of its enormous capitalization, bears directly or indirectly, and materially, upon the value of the Pennsylvania franchise. Obviously, the company cannot enjoy all of the practical advantages of an indus-

trial unit, and, at the same time, attempt to deny for tax purposes the integration of the enterprise and the effect of that integration on its business activities in this State.

Our conclusion, and the conclusion of the court below, regarding the unity of appellant's enterprise is not novel. In *Ford Motor Company v. Clark,* 100 F. (2d) 515, it was held that this appellant is a *unitary* enterprise. The court states, at page 518: *"The Ford Motor Company has no business except the making and selling of cars."* It is that business which appellant conducts in Pennsylvania. The decision last cited was affirmed by the Supreme Court of the United States in *Ford Motor Company v. Beauchamp,* 308 U. S. 331, in which Mr. Justice REED said, at page 336: "In a *unitary* enterprise, property outside the state, when correlated in use with property within the state, *necessarily affects the worth of the privilege within the state.* Financial power inherent in the possession of assets may be applied, with flexibility, at whatever point within or without the state the managers of the business may determine. . . . The weight, in determining the value of the intrastate privilege, given the property beyond the state boundaries is but a recognition of the very real effect its existence has upon the *value of the privilege granted within the taxing state."* See also *Ford Motor Co. v. Oklahoma Tax Commission,* 188 Okla. 78, 106 P. (2d) 803. Appellant's attempts to distinguish these cases do not detract from the conclusion therein that appellant's business is functionally *unitary,* and that its functional correlation affects materially the "value of the privilege granted within the state."

Appellant also urges that the court below and the Commonwealth erred in the application of the statutory formula by including in the multiplicand the book value of the stock of wholly-owned subsidiaries, without including in the denominators of the allocative fractions the tangible property, wages and gross receipts of those subsidiaries. In effect, appellant would have us disre-

gard entirely the entity of these corporations merely because the book value of their stock has been included in the assets of the corporation and is, therefore, reflected in the value of its own capital stock. The court below found as a fact that all of the assets of the appellant company, including such stocks, bonds, and other securities, are part of its working capital. As appellant does not carry the operating expenses and receipts of these corporations on its own books, and does not include them in its report of wages and receipts, there is no basis for their inclusion in the formula in law or in fact. That portion of appellant's capital invested in these stocks is no less a part of its working capital because the stocks are wholly owned by appellant. We therefore conclude that the Act of 1935, as interpreted by us in the *Columbia Gas and Electric* and *Mundy* cases, has not been violated by the Commonwealth's application of the formula in determining appellant's tax.

There remain for our consideration appellant's several contentions that the tax imposed violates the Federal and State constitutions. It is argued that the formula for measuring the base of the tax results in depriving appellant of its property without due process of law, in violation of the Fourteenth Amendment of the Federal Constitution, and is contrary to Article I, Section 9, of the State Constitution. This conclusion is predicated upon the assumption that the tax is a tax upon property, and that it falls upon property beyond the jurisdiction of the Commonwealth to tax, in the form of tax-exempt securities of the United States and tangible and intangible property having its situs in other states. We held in the *Columbia Gas and Electric Corp.* case, supra, that this is a franchise tax and not a property tax. This discussion need not be repeated. Nor is it necessary to labor the point that a franchise tax may be *measured* by property which would not, itself, be amenable to a property tax. In *Flint v. Stone Tracy Co.*, 220 U. S. 107, 165, it was said: "It is therefore well settled

by the decisions of this Court that when the sovereign authority has exercised the right to tax a legitimate subject of taxation as an exercise of a franchise or privilege, it is no objection that the *measure* of taxation is found in the income produced in part from property which of itself considered is nontaxable." See also *National Leather Co. v. Massachusetts,* 277 U. S. 413. And, in *Educational Films Corp. v. Ward,* 282 U. S. 379, at page 389, Mr. Justice STONE, now Chief Justice, stated: ". . . it has held with like consistency that the privilege of exercising the corporate franchise is no less an appropriate object of taxation by one government merely because the corporate property or net income, which is made the *measure* of the tax, may chance to include the obligations of the other, or the income derived from them." Another case in point is *Philadelphia Contributionship v. Commonwealth,* 98 Pa. 48. As the reflection of the value of United States bonds owned by appellant in the measurement of the tax is not a tax upon them, and is merely incidental to the operation of the formula, appellant's contention is not sound. The exclusion of the United States bonds from the measurement of the tax in the *Mundy* case, supra, was not upon constitutional grounds, but was directed because they did not form part of the working capital of the corporation taxed, and hence did not affect the value of the Pennsylvania franchise.

Appellant contends further, that, even if the tax in question is a franchise tax, the same sections of the Federal and State constitutions are violated by its imposition in the manner here approved, because the formula of measurement adopted by the legislature does not reasonably reflect the value of appellant's franchise, but results in an arbitrary allocation to this State of appellant's property in other jurisdictions. Appellant has endeavored to show, by estimates from its books, using its own "direct" method of allocation, and the "indirect" method of allocation provided by the statutory formula, that

the determination of its tax by the Commonwealth has this unconstitutional effect. Since this argument is based principally upon appellant's erroneous contention that it is a *multiform* enterprise, it requires nothing more than general discussion. Of appellant's "direct" method of determining the base for the franchise tax, it is sufficient to say that this method would not give proper weight in the value of the franchise to the advantages which it derives by its operation of a huge *unitary* enterprise. While we have conceded that an exact measurement of the value of a corporate franchise is impossible of attainment, we held in the *Columbia Gas and Electric Corp.* case, supra, that the method adopted by the legislature for this purpose in the Act of 1935 represented a reasonable and just attempt to determine that value. We there pointed out that the legislature had used in the formula three fractions which would reflect corporate activity in Pennsylvania in proper relation to the whole corporate activity. Chief Justice KEPHART said, at page 220: "If the legislature had chosen to use a single one of these fractions and applied the same to the entire capital stock, certainly it could hardly be contended that it would be without its powers, provided proper consideration be given in each case to the elements to be included or omitted in determining the value of the entire capital stock as the measure of the tax. The use of all three and the application of each to one-third of the entire capital stock value is simply an attempt to make the ultimate measure to which the tax is to be applied more representative of the actual worth of the franchise to do business and to allow the interplay of the factors to average out the hardship which might arise by reliance upon any single one."

Appellant's objection that there is no fraction representing the ratio of intangible property used in this State to intangible property everywhere, was also raised by the appellant in the *Columbia Gas and Electric Corp.* case, supra, and is adequately answered by that opinion.

Clearly, the legislature is not bound to seek out and apply every possible permutation and combination of measurement that might have some bearing on the value of the franchise. In *Ford Motor Company v. Beauchamp,* supra, the United States Supreme Court sustained the formula of the Texas legislature which made the base of the franchise tax that proportion of capital stock, surplus and undivided profits, plus long term obligations, determined by the ratio of the gross receipts in the State to the total gross receipts of the corporation. This formula included only one of the three allocation fractions used in our statutory measure. In *Ford Motor Co. v. Oklahoma Tax Commission,* supra, the franchise tax formula of Oklahoma, also measured by capital stock, included only two of our three allocating fractions. See also *Southern Pacific Co. v. State Corporation Commission,* 41 N. M. 556, 72 P. (2d) 15; *Roberts & Schaefer Co. v. Emmerson,* 271 U. S. 50; *International Shoe Co. v. Shartel,* 279 U. S. 429. The fact that the same allocating fractions are used in determining the base of the tax on net income of foreign corporations does not render them inappropriate for the determination of a franchise tax base measured by capital stock. Since they merely reflect *business activity* within the State they are equally appropriate to either determination. See *Butler Bros. v. McColgan,* 315 U. S. 501.

Appellant also contends that the Act of 1935, and the tax imposed upon it, violate the Fourteenth Amendment to the Federal Constitution by depriving it and other foreign corporations of the equal protection of the laws, and by discrimination in favor of domestic corporations. It is also maintained that Article IX, Section 1 of the Constitution of Pennsylvania, requiring taxes to be uniform upon the same class of subjects is violated. Despite the numerous authorities cited by appellant, it has failed utterly to sustain its charge of discrimination. Before the Act of 1935, both domestic and foreign corporations were subject to a capital stock tax. This was a tax upon

*property.* Because of the unequal operation of the tax in the case of domestic and foreign corporations, the legislature adopted a franchise tax upon foreign corporations to achieve a greater degree of equality between the two classes. Equality of taxation does not require *identical* taxation. As we pointed out in the *Columbia Gas and Electric Corp.* case, supra, at page 227: "It is scarcely necessary to cite authorities that a state may differentiate in its method of taxing between foreign and domestic corporations." See *Kansas City &c. R. R. Co. v. Stiles,* 242 U. S. 111. Neither the Fourteenth Amendment nor Article IX, Section 1, of our Constitution, forbids classification justified by obvious differences in subjects of taxation. The incidence and base of taxation may be different in the case of foreign and domestic corporations. See *Pennsylvania Company, etc., Trustee, Case,* 345 Pa. 130, 135, 27 A. 2d 57.

The alleged discrimination in our tax laws against foreign corporations and in favor of domestic corporations is said to lie in the fact that domestic corporations enjoy certain exemptions in the computation of their tax base which are denied to foreign corporations. In this contention there is apparent again appellant's studied confusion of the essential differences between a *property* tax and a *franchise* tax. Certain property of domestic corporations, including United States obligations and tangible property having an extraterritorial location is excluded from the valuation of their capital stock for purposes of the direct tax. Obviously, this property could not constitutionally be included. Similar property, if owned by a foreign corporation and so employed by it as to affect the value of the franchise in Pennsylvania, is, on the other hand, included in the *measurement* of the base of the franchise tax. The property itself is not taxed in the case of either domestic or foreign corporations. Such differences as result, result not from an intention of the legislature to discriminate against foreign corporations, but from the divergent natures of the taxes im-

posed on the two classes. See *Colgate v. Harvey*, 296 U. S. 404. The Commonwealth has demonstrated that a heavier tax burden falls more heavily on domestic corporations, by the capital stock tax, than falls upon foreign corporations subject to the payment of the franchise tax. In short, if appellant were a Pennsylvania corporation, it would pay more in capital stock taxes, utilizing the same property here, than it now pays in franchise taxes. While this demonstration does not afford an exact comparison (*Columbia Gas and Electric Corp.* case, page 159), it does lend strength to the Commonwealth's contention that there is a certain equivalence between the two forms of taxation despite the necessary differences in their application of which appellant complains.

The further contention of appellant that the statutory formula produces inequalities within the class of foreign corporations subject to the franchise tax is specious. Taking two hypothetical corporations, each of which is engaged in a *multiform,* rather than a unitary enterprise, it devotes an additional brief, replete with graphs, charts and mathematical assumptions, to proving that the corporation which, in this State, engages in a separate corporate function utilizing the greater amount of tangible property, would pay a higher tax, although both corporations, theoretically, had the same quantity of gross capital. If it were not for our decisions in the *Columbia Gas and Electric Corp.* and *Mundy* cases, supra, excluding from the measurement capital employed outside of the State in *unrelated* corporate functions, these interesting calculations might have some significance. It is sufficient to say, however, that neither of the hypothetical corporations would be taxed under the Act of 1935 by what appellant refers to as the "Commonwealth's Method", and that consequently, the inequality presumed by appellant would not arise. Appellant as a *unitary* enterprise, would not be affected, in any event, by the application of the formula in its suppositious cases.

Finally, appellant contends that the tax imposed by the Act of 1935 resulted in an impairment of its contract with the Commonwealth, in violation of Article I, Section 10, of the Federal Constitution, and Article I, Section 17 of the Pennsylvania Constitution. This conclusion is predicated upon two assumptions; first, that the Commonwealth was obligated by a contract created by the legislature in Section 1010 of the Business Corporation Law of 1933, 15 PS 2852, to treat domestic and foreign corporations with equality in all matters, including taxation, and, second, that foreign corporations have not been so treated because of the substitution of the present franchise for the capital stock tax previously imposed upon them. Without discussing the first assumption, or considering whether the asserted contract was limited by implicit or explicit reservations of power to the Commonwealth to revoke or modify the authority granted a foreign corporation to do business here, we may dispose of this constitutional objection briefly by pointing out that appellant has failed to prove discrimination by the State against it, as a foreign corporation, in favor of domestic corporations. *Equality* of treatment does not, as we have heretofore stated, require or imply *identity* of treatment. It is not necessary to impose upon domestic and foreign corporations identical taxes by identical methods. An equivalent tax burden is imposed on both classes of corporations, which is a sufficient compliance with the contract appellant derives from the section of the Business Corporation Law cited. We have examined most carefully the briefs in this case, and in a companion case, *Commonwealth v. Quaker Oats Company,* 350 Pa. 253, including the brief of amici curiæ, and have found in them no controlling authority contrary to our conclusion.

The judgment of the court below is affirmed; costs to be paid by appellant.