Commonwealth, Appellant, *v.* Quaker Oats Company, Appellant.

Argued May 24, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES. JJ.

reargument refused September 25, 1944.

*Roy J. Keefer,* with him *W. A. Seifert, Reed, Smith, Shaw & McClay, Geo. Ross Hull* and *Hull, Leiby & Metzger,* for appellant No. 24.

*H. F. Stambaugh,* with him *B. B. Bastian,* Deputy Attorney General, and *James H. Duff,* Attorney General, for appellee No. 24.

*John G. Buchanan,* with him *William Booth* and *Smith, Buchanan & Ingersoll,* amici curiae under Rule 61.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 30, 1944:

These appeals like the appeal in *Commonwealth v. Ford Motor Company,* 350 Pa. 236, are from the judgment of the court below affirming, with some modifications, the resettlement by the Department of Revenue of the franchise tax of a foreign corporation. As in that case, appellant contends first that the Commonwealth erred in applying the statutory formula of the Act of May 16, 1935, P. L. 184, 72 PS 1871, and secondly, that, if applied correctly, the formula results in unconstitutional taxation. It is unnecessary to repeat here the observations made in the *Ford Motor Company*

case concerning the purpose, structure and operation of the Act of 1935, nor to reiterate at any length our opinions there expressed regarding the incidence and constitutionality of the franchise tax, generally. We will, however, review in some detail the facts of appellant's case and its contentions that the tax imposed upon it violates the statute and appellant's constitutional rights.

The Quaker Oats Company was incorporated under the laws of New Jersey to manufacture and deal in cereals and cereal products. In 1933 it received a Certificate of Authority to transact in this Commonwealth the business of "selling and dealing in cereals and cereal products." In the tax year involved in this appeal, 1935, appellant's principal office was in Chicago, Illinois. It was engaged in the purchase, storing and manufacture of cereal and cereal products, employing for these purposes land, buildings, grain elevators, railroad equipment, machinery, mills and other tangible property located outside of Pennsylvania. It controlled and owned all, or a majority, of the shares of fifteen subsidiary companies, including a hydraulic power corporation which supplied power to the parent company for manufacturing purposes, and several companies domiciled in Europe and South America. Three of these subsidiaries were inactive in 1935. Throughout the United States and abroad it maintained a vast selling enterprise for the marketing of its own products and the products of its subsidiaries. The total value of its assets was $60,821,913, including working capital of $14,901,015 in United States Government securities, and $1,117,545 in state, county, and municipal obligations, used in the purchase of raw cereals.

In this State appellant had two sales offices, one at Pittsburgh and the other at Philadelphia. Here orders were taken by its salesmen for flour, corn meal, animal and poultry foods, breakfast foods and other cereal products, some of which were sold in packages and some in bulk. A local inventory of goods, insufficient to supply all orders originating in Pennsylvania, was stored

here in public warehouses. Other tangible property included automobiles used by the salesmen, and office furniture and equipment. The total value of appellant's tangibles in this Commonwealth was $22,440. None of the subsidiary corporations transacted any business in Pennsylvania or owned any tangible property here. The Pennsylvania payroll of appellant was $143,259. Of its total gross receipts of $66,067,332, *more than one-tenth,* or $7,224,347 was assigned by the court below to Pennsylvania. Bank accounts were maintained at Pittsburgh and Philadelphia.

Upon the basis of appellant's report, the franchise tax for 1935 was settled at $4,655, which was subsequently revised to $28,645. Appellant obtained a review whereupon the tax was resettled at $16,495. On appeal from the resettlement, the court below excluded from the value of the capital stock in the formula the sum of $114,196 which represented the value of the stock of the inactive subsidiaries, thereby reducing the multiplicand. However, the numerators of the three allocative fractions were increased, with the result that, on the final determination, the tax was increased to $16,637.

Appellant contends, as did the appellant in the *Ford Motor Company* case, that it is a *multiform* enterprise. It has attempted to segregate its activities into three functions, which, it maintains, are unrelated, namely: (1) the purchase and storage of grains, (2) the manufacture of cereals and cereal products, and (3) selling and dealing in cereal products. As only the last of these functions is carried on in this State, appellant asserts that the value of capital stock employed in the first two functions should be excluded from the multiplicand. Actually, however, the record indicates that such segregation of functions is entirely artificial, and that appellant is engaged in an unitary enterprise. In its proof, appellant did not even attempt to segregate the wages, tangible property and gross receipts of the three "unrelated" functions, so that there is, on this record, no factual

basis for a revision of the allocative fractions in the formula. Appellant's estimate of capital employed exclusively in the "selling and dealing" function, derived from its corporate balance sheet, is conceded to represent assets "which were, *or a part of which may have been,* employed in selling." Its witnesses testified that the production and sale of packaged goods and goods in bulk by the company were inter-related, that they enjoyed a common source of supply, that the national advertising and good-will of the whole enterprise affected sales in Pennsylvania, that the corporate revenues were derived from the ultimate sale of the products resulting from the purchases and manufacturing. Obviously, the purchasing, storing and manufacturing processes of appellant were not complete and distinct corporate activities, or businesses. They were not self-sustaining or an end in themselves. They were conducted in aid of the selling activities, with which they are interlocked and integrated. The entire enterprise is unitary in purpose and result. This is not a situation like that referred to in *Adams Express Co. v. Ohio,* 165 U. S. 194, or that before us in *Commonwealth v. Columbia Gas and Electric Corp.,* 336 Pa. 209, 8 A. 2d 404, in which a corporation conducts diverse forms of business having no unity save unity of ownership, and no common relation save by separate contributions to the total revenue of the corporation. This is a true unitary enterprise, having its inception in the purchase, storing, and manufacture of cereals and cereal products, and its consummation in their sale. The court below has so found, and as the record sustains the finding, it is conclusive upon us.

We have, in the *Ford Motor Company* case, rejected the contention, made also by this appellant, that the formula employed by the legislature in Section 21(b) of the Act of 1935 to evaluate the franchise of a foreign corporation doing business here is inherently arbitrary and unreasonable, and that it results in taxing property and business outside of this State. We have also rejected

the arguments, advanced again in this appeal, that the tax on the franchise of foreign corporations imposed by the Act of 1935 is a property tax; that it violates the equal protection clause of the Federal Constitution, and our Constitution, by discriminating against foreign corporations in favor of domestic corporations; that it is not uniformly imposed on corporations in the same classification, and that it contravenes the clauses of the Federal and State constitutions prohibiting the impairment of the obligations of contracts and the taking of property without due process of law. No purpose would be served by repeating here what we said in that case.

Appellant has failed to prove, with respect to its specific tax, that any of these constitutional provisions has been violated. The court below found that all of the corporate assets were, with the exception of its investments in the stock of three inactive subsidiaries, actively used in the unitary enterprise of appellant, and that their use affected the value of the Pennsylvania franchise. The tax is not imposed *upon* any of this property, but upon the value of the Pennsylvania franchise, *measured* by the capital stock related to the business activity of appellant in this State. The right of the State to use such a measure to reasonably determine the enhancement of the value of the local franchise by the employment of extra-territorial property is fully discussed in the *Ford Motor Company* case, and need not be here reviewed.

Nor is it necessary to devote additional discussion to appellant's contention that the tax falls upon exempt Federal, State and municipal securities. The court below has found, and appellant concedes, that these securities "were employed or held as a reserve by [appellant] in its purchasing business". As the purchasing function was related by integration to the selling function, and as it affected the value of appellant's franchise in Pennsylvania, the inclusion of these securities in the formula producing the tax base was proper. They, themselves, were not taxed.

A considerable portion of appellant's argument is directed to alleged error in the composition of the gross receipts fraction of the formula. The Commonwealth and the court below used, as the numerator, the total amount of sales originating in, and attributable to the two sales agencies operated in this State by appellant. Appellant contends that there should have been excluded all sales negotiated by salesmen of the Pennsylvania agencies but consummated by the approval of the home office. Section 21(b) of the Act provides: "The amount of the taxpayer's gross receipts from business assignable to this Commonwealth shall be the amount of its gross receipts for the taxable year from, (1) sales, *except those negotiated or effected in behalf of the taxpayer by agents or agencies chiefly situated at, connected with, or sent out from premises for the transaction of business owned or rented by the taxpayer outside the Commonwealth. . . .*"

Appellant would have us construe this to mean that sales attributable to Pennsylvania must be only those which are both *negotiated and effected* within the State, using "effected" in the sense of *consummated,* or *completed.* Such a construction would, of course, enable this appellant, or any foreign corporation, to eliminate the third allocative fraction from the tax formula by so arranging its sales machinery that all contracts would be "accepted", and therefore consummated, at the home office. This is clearly contrary to the intention of the legislature, which was that the gross receipts fraction should reflect that portion of *corporate activity* conducted in this State resulting in gross receipts to the corporation in the form of sales, rents and royalties. To assign to the word "effected" the meaning urged upon us by appellant would controvert and frustrate the legislative purpose. "Effected" has no technical meaning as a legal word of art. It is used in different senses, and often, loosely in contracts and statutes. Here, it is clear that it was intended to mean "accomplished" or "brought

about": See Webster's New International Dictionary (unabridged). Given that meaning, it is consistent with the context and purpose of the section. The case of *Commonwealth v. Continental Rubber Works,* 347 Pa. 514, cited by appellant, supports this construction and opposes the construction for which appellant contends. There we held that sales negotiated by a branch sales office in New York, but *approved* and *accepted* in Pennsylvania, were assignable *outside* of Pennsylvania under Section 21(b) above quoted. While it is true that the legislature excepted sales negotiated *or* effected outside of Pennsylvania, it is clear that it would not have intended the inclusion in the fraction of only those sales which were *both* negotiated and technically completed in this State, or by salesmen operating from agencies in this State.

Even if the Act were not so construed, it appears that many of appellant's sales were concluded in Pennsylvania. In the case of orders for bulk goods, for example, a written contract of sale was executed *in Pennsylvania* after approval of the home office in Chicago was obtained. Orders for packaged goods were received in the Pennsylvania offices and the sale was consummated there if no disapproval was received from Chicago within two days. Even if these sales are considered to be consummated in Chicago by an implied acceptance, appellant has not offered any proof of the segregated amount of such sales. The burden was upon it, on appeal to the court below from the resettlement of the tax, to show the error of the Commonwealth's computation.

Appellant's final argument is, that if Section 21(b) is to be construed to include in the gross receipts formula sales consummated outside the Commonwealth or made in interstate commerce, that this tax violates the commerce clause of the Federal Constitution and imposes an unreasonable burden on interstate commerce. In this connection, appellant again conveniently overlooks the fact that the tax is imposed upon the privilege of doing

business here, measured by capital stock. It is in no sense a tax on sales or on interstate transactions. Sales enter into the determination of the tax only as an index of business activity in this State. They are merely a factor in one of three allocative fractions designed to reflect such activity. There is no question, therefore, of taxing sales here or elsewhere. Appellant is not engaged in interstate commerce alone, and is not being taxed here for the privilege of doing an interstate business. The fact that its interstate business and its property in other jurisdictions enter into the computation of the tax because they affect the value of the Pennsylvania franchise does not make the tax, ipso facto, an unreasonable burden on interstate commerce in violation of the commerce clause. The burden imposed by the Act of 1935 is incidental and reasonable. As stated by Mr. Justice STONE, now Chief Justice, in *International Shoe Co. v. Shartel,* 279 U. S. 429: "A franchise tax imposed on a corporation, foreign or domestic, for the privilege of doing a local business, if apportioned to *business done* or property owned *within* the state, is not invalid . . . because a part of the property or capital included in *computing* the tax is used by it in interstate commerce." See also *St. Louis S. W. Ry. Co. v. Arkansas,* 235 U. S. 350; *Hump Hairpin Co. v. Emmerson,* 258 U. S. 290. And in *Southern Realty Corp. v. McCallum,* 65 F. (2d) 934, certiorari denied 290 U. S. 692, it was stated, "The origin, form, and location of that capital, whether in or out of the state, is unimportant, provided it is to contribute to the corporation's business power within the state. . . . That a state may impose such a franchise or business privilege tax, and may measure it by the capital stock and surplus used by the corporation in its business, or by its income therefrom, although business is done in more states than one, without unconstitutional interference with interstate commerce or other Federal prerogative, and without a taxing of property beyond the jurisdiction of the taxing state, when the capital by

which the tax is measured is reasonably apportioned according to the business there done, is settled by many decisions."

The judgment of the court below is affirmed; costs to be paid by appellant.