Commonwealth *v.* Hellertown Manufacturing
Company, Appellant.

Argued May 26, 1969. Before BELL, C. J., COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused May 7, 1970.

*Herbert L. Levy,* with him *Robert Margolis,* for appellant.

*George W. Keitel,* Deputy Attorney General, with him *William C. Sennett,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE COHEN, March 20, 1970:

This appeal by Hellertown Manufacturing Company (Hellertown) involves the proper computation of its Pennsylvania corporate net income tax for the year 1961.

Hellertown is a Delaware corporation registered to do business in Pennsylvania with manufacturing facilities located in Hellertown, Pa. It is a wholly-owned subsidiary of Champion Spark Plug Company (Champion) a Delaware corporation located in Ohio. Hellertown's sole business activity involves the manufacture of spark plugs and allied products, all of which are sold by it to Champion and shipped by it to Champion's customers on orders of Champion.

In its corporate net income tax report for 1961 Hellertown allocated all of its tangible property and all of its wages, salaries, etc., to Pennsylvania while allocating over 98% of its gross receipts to Ohio. The Pennsylvania taxing officials (Commonwealth) disallowed all allocations and taxed Hellertown's income 100% in Pennsylvania. The tax as computed by Hellertown was $18,809.94; as computed by the Commonwealth it was $28,029.57; the difference is $9,219.63.

The settlement by the Commonwealth proceeds on the assumption that all of Hellertown's business is transacted in Pennsylvania. Therefore, pursuant to §2 of the Corporate Net Income Tax Act of May 16, 1935, P. L. 208, as amended, 72 P.S. §3420b (Act), the only correct way to compute Hellertown's tax, says the Commonwealth, is to apply the tax rate of 6% directly to federal taxable income of $467,159.14.

Hellertown, to the contrary, insists that not all of its business is transacted in Pennsylvania. Therefore, according to §2 of the Act, the only correct way to compute its tax, says Hellertown, is to apply the allocation fractions permitted by the Act in such a case to the federal taxable income. Conceding that all of its tangible property and all of its wages and salaries are allocable to Pennsylvania, Hellertown, nevertheless, insists that virtually all of its gross receipts are negotiated or effected by its agents located at an office maintained by it in Ohio and that its allocation of these gross receipts outside of Pennsylvania is thus properly made in accordance with the statute.

Obviously, the facts are important. They are undisputed here. Hellertown was incorporated in 1950 and began its operations in Pennsylvania in 1951. From that date on it engaged in the manufacture of spark plugs which were imprinted with the name "Champion," which were ordered by and sold to Champion to the extent of Hellertown's complete output, which were

sold by Champion to its customers and shipped by Hellertown directly to those customers at Champion's order and which were billed by Hellertown to Champion and paid for by Champion to Hellertown. None of the ultimate sales by Champion to its customers of spark plugs manufactured by Hellertown were sold or shipped to buyers located in Pennsylvania.

Hellertown's affairs are governed by five officers: a president, vice-president, treasurer, secretary and assistant secretary. The first four of these are the same persons as are the president, vice-president, treasurer and secretary of Champion. The assistant secretary of Hellertown, who is not an officer of Champion, is general manager of Hellertown's manufacturing plant in Hellertown, Pa. This last officer also resides in Hellertown; the other four all reside in Toledo, Ohio.

Champion owns an office building in Toledo where the four joint officers have offices. Hellertown's name is on the door of this building. Correspondence between Toledo and Hellertown always is on stationery showing Hellertown, Pa., as Hellertown's address; correspondance with third persons is sometimes on similar stationery, sometimes on other stationery which contains a legend that replies be addressed to Toledo. At this Toledo office persons on Champion's direct payroll provide Hellertown with administrative, research, engineering and factory management services; with engineering and research on spark plug design, application and materials; with drawings and blue prints; and with time study standards. New machinery for the Hellertown plant is designed and ordered at Toledo. Staff at Toledo sets inspection and material standards and writes production specifications for all spark plugs.

These Toledo employees of Champion, together with the above-mentioned officers of both companies, determine all of Hellertown's employment and person-

nel policies, conduct its labor negotiations, establish its budget and generally fix and carry out all of its executive and administrative polices. These last include, among other things, insurance negotiations, decisions regarding legal and accounting problems and all F.T.C. and I.C.C. matters.

In 1961, Hellertown paid Champion a "management fee" of $548,331.87. This figure represented 15% of the direct cost of labor and materials entering into Hellertown's production activities and was fixed by oral agreement between Hellertown and Champion. According to the record, this fee is paid to Champion for the various services described above as well as for a rental factor for the Toledo offices.

Although we have already mentioned how sales of spark plugs are handled by Champion and Hellertown, the parties went into the procedure in great detail; and in order to present as clear a picture as possible, we shall also summarize the procedure more fully. All spark plug orders are received by Champion in Toledo. Champion's employees process the orders and decide whether they are to be filled by Hellertown or from one of Champion's other production facilities. If Hellertown is selected, instructions are forwarded to it from Toledo. Hellertown (which usually has a large inventory of finished spark plugs on hand) ships the goods directly to Champion's customer, notifies Champion and bills it for the shipment according to a pricing schedule supplied by Hellertown's officers in Toledo. Champion bills the customer directly from Toledo and handles all credit and collection problems from there.

Finally, Hellertown showed that it had registered to do business in Ohio and paid Ohio its minimum franchise tax.

Based upon these various facts, the court below held that (1) Hellertown was not "transacting business"

outside of Pennsylvania, and thus, could not use the apportionment fractions, (2) Hellertown "negotiated" no sales and (3) Hellertown "effected" no sales from any location but Hellertown. Points (2) and (3) obviously were unnecessary conclusions after point (1) was stated; but the references to these other points illustrate some of the difficulties inherent in this situation. We shall discuss them below.

The problem is purely statutory. If all of Hellertown's business is transacted in Pennsylvania, its corporate net income tax is computed by applying the tax rate directly to federal taxable income (less any special deductions not involved here). If all of its business is not transacted in Pennsylvania, it is entitled to allocate in accordance with the traditional three-fraction formula (Hellertown had no capital gains or losses subject to special allocation). Under this formula tangible property is allocated to the state of location; wages of employees are allocated to Pennsylvania unless the employees are situate at, sent out from or connected with premises maintained by Hellertown outside of Pennsylvania; and gross receipts from sales are allocated to Pennsylvania unless the sales were negotiated or effected by agents of Hellertown situate at, sent out from or connected with premises maintained by Hellertown outside of Pennsylvania. We recently discussed aspects of these fractions in another appeal which raised questions concerning the meaning of the statutory language. *Commonwealth v. General Foods Corporation*, 429 Pa. 266, 239 A. 2d 359 (1968).

Hellertown's problem involves a form of sequential reasoning. First, either all of its business is transacted in Pennsylvania or it is not. If it is, Hellertown may not allocate. If it is not, Hellertown may allocate. In the present context it must then prove that it maintains an office outside of Pennsylvania at, from or with which its agents are situate, sent out from or con-

nected. Finally, surmounting this hurdle, it must show that such agents negotiate or effect the gross receipts which it receives from Champion.

With respect to the first of these, we have little difficulty. Recently, in *Comomnwealth v. Tube City Iron and Metal Company,* 432 Pa. 600, 248 A. 2d 225 (1968), we dealt specifically with this issue of "transacting business" and ruled that it imposed a practical, not a technical, test. If the taxpayer is present (e.g. through administrative functioning, property ownership or sales activity) in some fashion outside of Pennsylvania and if this presence is related to its actual business activity, it is transacting business outside of Pennsylvania. This conclusion follows without reference to whether or not the taxpayer is "doing business" elsewhere as that term is customarily used, is registered to do business in another state in accordance with that state's corporation laws or pays a privilege tax to that state.

Here, it is unquestioned that Hellertown's administrative machinery and executive policies are operated and established by its officers at Toledo, Ohio. These activities are as essential to Hellertown's manufacturing activity as are the actual production operations at its plant and are equally a part of its "business." Consequently, we have no problem in concluding that not all of Hellertown's business is transacted in Pennsylvania and that it is entitled to use the allocation fractions.

Therefore, we come to the second issue: does Hellertown maintain an office outside of Pennsylvania? The word "maintained" was not in the statute as it was originally enacted. The original language, appearing in the Act in 1935 stated that all gross receipts from sales (and all wages) were to be allocated to Pennsylvania except those receipts from sales (or those wages paid) attributable to personnel located at, sent

out from or connected with premises "owned or rented" by the taxpayer. Act, §2.

This language remained in the statute only four years. In the reenactment of the Corporate Net Income Tax Act by the Act of May 5, 1939, P. L. 64, the phrase "owned or rented" was eliminated and the present single word "maintained" was substituted for it. Although other changes were subsequently made in the language of the section, none affect this situation; and none have altered the word "maintained."

It is obvious, of course, that there is a difference between the phrase "owned or rented" and the word "maintained." "Owned or rented," fairly interpreted, means just what it denotes—that the taxpayer either owns real estate (in whole or in part) outside of Pennsylvania on, in or with which it is located or connected in some way or that the taxpayer is the lessee or sublessee of premises outside of Pennsylvania on, in or with which it is located or connected in some way. "Maintained," on the other hand, is less precise. Among its definitions in Webster's Third New International Dictionary is the following: ". . . 4: to provide for: bear the expense of . . ." (Geo. C. Merriam Company, Springfield, Mass. 1961). Thus, neither directly owning nor renting premises is necessary to satisfy its requirements. Correspondingly, it would seem that if the taxpayer in some way (and there may be many ways) is wholly or partly responsible for the presence or upkeep of premises outside of Pennsylvania, it has met the statutory test regardless of the form of the arrangement.

This problem is referred to in Stradley and Krekstein, *Corporate Taxation and Procedure in Pennsylvania* (Second Edition, 1952), page 230, where the following appears: "The ascertainment of whether the taxpayer maintains an office outside the state to which gross receipts may be assigned depends entirely upon

the circumstances. There are many factors that might constitute the maintenance of an office for the purpose of allocation. But what might be sufficient in one case would be inadequate in another; it is usually the combination of factors that add up to the necessary requirement. In other words the essentials may differ with the type of business, the type of agency or employment contract involved or the manner in which the taxpayer conducts its business. With this in mind the following check list might prove useful: (1) Name of taxpayer in telephone directory, on building directory if there is one, on door leading to entrance of office or otherwise displayed on the office exterior. (2) Stationery and calling cards showing office address. (3) Storage of inventories or display samples at location in question. (4) A written or oral lease for the space involved and the direct or indirect payment of rent. (5) A written or oral agreement for the maintenance of an office by the agent or agency on behalf of the taxpayer." We recognize that the determination of whether or not premises are "Maintained" by a taxpayer may be difficult, and we agree that the various factors must be weighed. In the above listing, for example, the fourth factor would be directly pertinent to proving actual rental of premises and would provide an easy answer. That is, if taxpayer pays for the use of premises and denominates each payment as "rent," whether to the lessor-owner or to a lessee-sublessor, the premises are being maintained by the taxpayer because he is actually renting them.

However, where a payment is made which is not clearly for the use of premises and is not denominated as rent, the situation requires careful scrutiny. Here, Hellertown paid a "management fee" to Champion, part of which (according to the testimony) was supposed to be for rent although it does not so appear on either party's books. If it is rent (i.e., payment for the use

of premises), of course, it makes no difference what it is called. While a problem of proof may arise, a conclusion that a payment is being made for the use of premises is enough to prove maintenance in the strictest sense.

While the first three factors mentioned by Stradley and Krekstein may be of assistance in supplying proof, we are only slightly impressed with the first two. Placing a taxpayer's name in a telephone directory or on an office door or a building or printing stationery or cards showing an office address is the easiest type of self-serving action which a taxpayer may undertake and can be done even where it is totally unnecessary. Here, for example, Hellertown's name is on the building; and it uses some stationery showing a Toledo return address; yet its mode of operation leaves little scope for needing such outward indicia of presence. Conversely, were such indicia not present, we would be equally unimpressed with an argument that this indicates a lack of premises maintenance because nothing leads us to believe it would be normal for a corporation like Hellertown to reveal itself publicly in any way.

We have dealt with this problem only twice before. In *Commonwealth v. Continental Rubber Works*, 347 Pa. 514, 32 A. 2d 878 (1943), we upheld the taxpayer's claim that it actually "rented" (the case arose prior to the 1939 amendment) out-of-state premises where the lease was in the name of its agent who received a commission and paid the rent out of the amount and where other factors tended to support the taxpayer's position (one of which was the maintenance of inventory at the premises—the third factor mentioned in Stradley and Krekstein's list). In that case it was crucial to our decision that the out-of-state person was found to be an agent, not an independent contractor,

for this meant his actions were taken on behalf of the taxpayer.

In *Commonwealth v. Minds Coal Mining Corporation,* 360 Pa. 7, 60 A. 2d 14 (1948), we affirmed a decision that gross receipts of the taxpayer were not assignable outside of Pennsylvania because no showing was made that the independent sales agent's New York office was, in fact, maintained by the taxpayer. Although we have recently questioned the analysis of the facts in this case, see *Commonwealth v. General Foods Corporation,* 429 Pa. 266, 277, 239 A. 2d 359, 365 (1968), and continue to do so, we would agree that if the sales actually in question were made from the outside office of an independent contractor and none of the payment made by the taxpayer to the contractor appear to be for the maintenance of the premises of the latter, none of the receipts are allocable outside of Pennsylvania.

In applying these criteria to Hellertown's situation, we note several factors of importance. In the *Continental Rubber* case, we were able to conclude that the taxpayer itself rented the outside premises because the nominal lessee was its actual agent and, therefore, his rent payments were the taxpayer's rent payments. On the other hand, in the *Minds* case, the lessee of the outside premises was an independent contractor; so the rent payments of the lessee could not be considered those of the taxpayer. The latter had to show (assuming the facts to be as stated) that its payments to the outside lessee-contractor either included an element for maintenance or that it was otherwise responsible for maintenance. It could not do this for the only payments it actually made were sales commissions.

Here, however, the situation differs markedly. The Toledo location of Champion was also the location at which Hellertown's own officers were situate. The sales in question were sales from Hellertown to Cham-

pion, not to the ultimate consumer. Finally, the payment from Hellertown to Champion was clearly not a sales commission; rather, it was a conglomerate payment for many services. Even assuming we cannot resolve the issue of whether or not any part of Hellertown's management fee constituted rent (payment for the use of premises by its officers), we nevertheless, must face the issue presented by the word "maintained." It is our conclusion that where part of a corporation's own business activity is carried on at a defined location and where that corporation reimburses or otherwise pays the actual owner or lessee a fee for the latter's services to it at that location, the corporation is participating in the maintenance of those premises because it is, at least in part, responsible for the continued upkeep of those premises. Any other conclusion, we believe, would fail to account properly for the 1939 change from "owned or rented" to "maintained." Therefore, we hold that the Toledo premises were maintained within the meaning of the Act by Hellertown.

Before leaving this issue, we should mention two other points. First, as is apparent from everything said thus far, Hellertown has made no effort here to claim an allocation of wages to its Toledo office even though the office maintenance criteria are identical to those involved in allocating gross receipts. We dealt with a similar situation in *Commonwealth v. American Gas Co.*, 352 Pa. 113, 42 A. 2d 161 (1945), where a subsidiary corporation also paid a management fee to its parent and where the agreement called for the parent to supply officers to the taxpayer corporation. The fee was specifically tied in to salary reimbursements for services of the officers. We held that the officers were employees of the taxpayer and that the fee was, in fact, a payment of wages and salaries to these employees. In the present case, however, nothing involved

in the management fee indicates it included a compensation component for the Toledo officers. Since a compensation payment between taxpayer-corporation and employee is required to allocate wages, Hellertown acted correctly herein not claiming such an allocation.

Second, the Act contains a separate and independent protection against maintenance of a sham office outside Pennsylvania. Buried in the gross receipts allocation language is the following sentence: "If a corporation maintains an office, warehouse, or other place of business in a state other than this Commonwealth for the purpose of reducing its tax under this subsection, the Department of Revenue shall, in determining the amount of its gross receipts from business assignable to this Commonwealth, include therein the gross receipts attributed by the corporation to the business conducted at such place of business in another state." Although we know of no attempt by the Commonwealth to utilize the sanction of this provision, we perceive it to be sufficient protection against a claim of outside maintenance of premises which are not *bona fide* to prevent abuse of the allocation theory of the statute. In the present case no such position is advanced by the Commonwealth, and we believe none could be so advanced. The office itself is real, fulfills a genuine purpose in adjusting functions between parent and subsidiary and actually serves as the nerve center of Hellertown's operations.

Passing on, then, to the final question, we must determine whether the receipts from the sales from Hellertown to Champion were "negotiated or effected" by Hellertown's "agents or agencies" situate at, connected with or sent out from the Toledo office. The court below, in its treatment of this issue, determined that (1) there were no negotiations "in the normal usage of that concept" and (2) the sales procedures described above

show that Hellertown's sales were effected by it at Hellertown, not Toledo.

These arguments, supported here by the Commonwealth, involve basically a combination of the following contentions: (1) there can be no negotiations between a parent corporation and subsidiary corporation since "negotiated" receipts, as used in the Act, require arm's-length give-and-take bargaining between the parties; (2) an "output" contract whereby a subsidiary agrees to sell all of its product to its parent cannot serve as a basis for allocation of receipts from sales under such contract for an indefinitely extended time period; and (3) the daily sales procedures (described above) used by Hellertown and Champion confirm that all of the former's sales were effected at Hellertown.

The phrase "negotiated or effected" has been discussed infrequently since it first appeared in the Act in 1935. In *Commonwealth v. Electric Storage Battery Co.*, 51 Dauph. 90 (1941), the court dealt with a claimed allocation of gross receipts to New York for the year 1935 as a result of negotiations which had occurred between 1929 and 1932 between the buyer and a New York based representative of the seller who later (after completion of the negotiations but prior to 1935) was transferred to Philadelphia. These negotiations had resulted in an agreement between the parties whereby the seller was to supply half the requirements of the buyer, the price to be determined as sales were made and the term of the agreement indefinite. The court held that the 1935 receipts were allocable to New York as a result of the earlier negotiations by the transferred employee while he was located in New York; it quoted the definition of "negotiate" found in *People v. Augustine*, 232 Mich. 29, 204 N.W. 747, repeated in *Werner v. Hendricks*, 121 Pa. Superior Ct. 46, 182 A. 748 (1936), and in Black's

Law Dictionary (4th Ed. 1951), page 1188: "To transact business; to treat with another respecting a purchase and sale; to hold intercourse; to bargain or trade; to conduct communications or conferences. It is that which passes between parties or the agents in the course of or incident to the making of a contract; it is also conversation in arranging terms of contract."

Many years later, the same court dealt with a different aspect of the same problem in *Commonwealth v. Safe Harbor Water Power Corp.*, 83 Dauph. 11 (1964), rev'd on other grounds, 423 Pa. 101, 223 A. 2d 223 (1966). Here, a Pennsylvania based producer of electric energy sold all of its output to two electric companies which owned all of its stock. Its generating plant was in Pennsylvania at all times; its administrative and executive functions were performed at offices maintained by it, first, in Baltimore and, later, in New York. The division of electric energy produced by the company was agreed upon between its two parents pursuant to a contract lasting until, at least, 1980; and an order of the Federal Power Commission fixed the price to the company at a figure to yield a 5% rate of return on its rate base.

The lower court dwelt on the fact that the taxpayer was really just a creation of its two stockholders-buyers and that the arrangements between the latter for the division of its output of energy were hardly a product of arm's-length negotiations with the taxpayer. In addition, the court noted that sales of energy were made at a price fixed not by negotiation, but by the F.P.C. These factors, the court said, indicated a lack of negotiation and that the receipts were effected simply by the creation of the taxpayer in Pennsylvania by its parents. It concluded: "To construe the language of the Corporate Net Income Tax Act pertaining to the allocation of gross receipts so that parent corporations could impose on their wholly owned sub-

sidiary a non-negotiated contract for the entire output of the subsidiary for a period of fifty years and executed at a point outside of Pennsylvania convenient to the parents, and thus require the allocation outside of Pennsylvania of all gross receipts for fifty years, would be an absurd and untenable construction contrary to the Statutory Construction Act, Act of May 28, 1937, P. L. 1019, §52 (46 P.S. §552)." 83 Dauph. 11, 24.

We have never dealt with this issue in a way completely determinative here. In *Commonwealth v. Quaker Oats Co.,* 350 Pa. 253, 38 A. 2d 325 (1944), we discussed the word "effected," pointing out that in the Act it means "accomplished" or "brought about" and also ruled that the Act did not require sales to be both negotiated and effected in Pennsylvania to be allocated to this state. And in *Commonwealth v. Minds Coal Mining Corporation,* supra, we referred to the statutory phrase as referring to the activities which brought about or resulted in a sale. In neither case did we dwell on the exact type of problem we have here, however; and both cases serve only as general guides for decision.

Part of a conceptual framework for determining gross receipts allocation problems appears in a recent decision, *Commonwealth v. General Foods Corporation,* supra. There we referred briefly to these problems in the following language: "Modern techniques of communication and transportation have transformed business methods sufficiently that traditional concepts of 'negotiated or effected' may necessarily be inappropriate to determine all cases. Nevertheless, these two words remain the operative ones of the statute; and they must be applied in light of whatever facts appear in a particular case. Thus, if the technique of selling presented involves an initial customer contract, a subsequent approval of the customer and placement of

him on the seller's list of customers, and continued placement of orders by the customer directly to a distribution center of the seller, a careful analysis must be made to discern where the significant selling actions occur. The initial contracts between customer and seller may actually involve the negotiation and effectuation of a long-continued series of sales if these contacts actually involve an agreement to buy and sell. Where, however, only a status (e.g., approved customer) is determined, it is clear that no sale is made; and subsequent events must be scrutinized. Somewhere in the relationship of buyer and seller something happens which brings about a sale; when it does, an allocable event occurs." 429 Pa. 266, 280-81, 239 A. 2d 359, 366-67.

Essentially, what we said there—and reaffirm here—is that gross receipts allocation, once found to be proper, is a matter of statutory rules. Subject to the basic rule that allocation reflect corporate activity in Pennsylvania, we must rely upon the Act to guide us. Otherwise, we would find ourselves enmeshed in a never-ending series of judicial glosses on the statutory language and a concomitant confusion in corporate tax concepts.

Here, for example, we are confronted squarely with an opportunity to promulgate such a judicial deviation from the language of the Act in the argument upheld by the court below that there can be no negotiation absent an arm's-length relationship between the parties. What this really means, of course, and we perceive the Commonwealth so to argue, is that certain corporate taxpayers (e.g., corporate subsidiaries located in Pennsylvania and selling all of their output to their parents) are *ab initio* excluded from invoking the statutory allocation rules and, because of the negative wording of the Act, must necessarily allocate all of their receipts to Pennsylvania.

Another, similar judicial overriding of the statute can be seen in the lower court's statement that a long-term output contract cannot serve as a basis for allocation for an indefinite future. We understand the court's position here not to be limited to non-arm's length cases but generally applicable to all situations. Here, too, we perceive serious problems. How long will allocation be permitted—i.e., how long in the future is too long? In the *Electric Storage Battery Co.* case the same lower court as here respected allocation under a contract entered into several years earlier; so, apparently, more than one year would be all right.

We prefer to avoid these difficulties. While strict adherence to the language and rules of the Act itself requires the closest scrutiny of factual elements in a given situation, we believe this approach is more conducive to sound administration of our laws. Thus, even though a parent-subsidiary relationship may inject an element of confusion, we have not before let it alone justify our disregarding the separate corporate identities and applying a rule different from the normal one. Certainly, were Hellertown here arguing that its existence should be ignored, its facilities treated solely as those of Champion and the only meaningful sales here being those of Champion to its customers, the Commonwealth would object strenuously. See for example, *Commonwealth v. Penn Fruit Co.*, 78 Dauph. 300 (1962).

No question is raised here that Hellertown is a sham corporation, nor has the Commonwealth produced any proof or even suggested that the operations of Hellertown and the relationships between it and Champion were other than normal ones. Therefore, we must squarely face the question: were the receipts of Hellertown from [sales to] Champion negotiated or effected by Hellertown's agents at the Toledo office? It is apparent from the record that all basic arrange-

ments between the parties were made at Toledo by the joint officers of the two companies. These arrange-ments include both the initial understanding that Hel-lertown would sell all of its output to Champion and subsequent pricing adjustments and placement of or-ders. The various day-by-day contacts and procedures whereby Hellertown actually shipped goods to the ulti-mate customers of Champion involve for the most part irrelevant factors whereby sales from Champion to these customers were consummated. The most impor-tant Hellertown-Champion contact is the actual ship-ping instructions issued by the latter to the former in each case; even if this be considered as the final step in the making of a sale, it is one which emanates from Toledo and only reinforces the out-of-state factors. In short, we find that the facts here support Hellertown's position that an out-of-state allocation is justified.

Since the income and allocation factors are pre-sented in the record, Hellertown's tax is readily de-terminable. Its tax should be resettled by applying the following allocation fractions to net income of $466,-499.50:

| | |
|---|---:|
| Tangible Property: | 2,914,673 |
| | 2,914,673 |
| Compensation: | 1,324,940 |
| | 1,324,940 |
| Gross Receipts: | 79,740 |
| | 6,029,651 |

The judgment of the court below is reversed and the proceedings are remanded to the court below for the entry of a judgment consistent with the provisions of this opinion.

Mr. Justice JONES took no part in the consideration or decision of this case.

154

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I must respectfully dissent. Because of the Hellertown Manufacturing Company's somewhat unique nature, I do not believe that it transacted business outside of the Commonwealth, and I do not believe that any portion of Hellertown's receipts was negotiated or effected outside of the Commonwealth.

# I

It is my view that Hellertown does not transact any portion of its business outside of the Commonwealth. As the wholly-owned subsidiary of its only customer, Hellertown exists solely at the whim of its parent. And as a company bereft of any marketing-distribution or technical capacity of its own, Hellertown is not a self-sustaining or independent economic entity. Viewed as only a production facility and not as an integrated economic entity, it is easily seen that Hellertown does not transact any business outside of the Commonwealth. Hellertown's corporate activity consists solely of the physical fabrication of spark plugs. The sale of these items, the formulation of administrative policy, and the general control of production methods are carried out by Hellertown's parent and not by Hellertown. I am therefore convinced that Hellertown does not transact any business outside of the Commonwealth.

The majority bases its conclusion that Hellertown does transact business outside of the Commonwealth on the fact that the officers of Champion resident in Ohio formulate Hellertown's executive policies and on the fact that other employees of Champion provide Hellertown with needed administrative and executive services. While I quite agree that the activities carried on in Ohio are necessary to the existence and functioning of the economic unit of which Hellertown is a con-

stituent part, I cannot agree that this activity is attributable to or a part of the Hellertown Manufacturing Company's corporate activity. I believe that the management activities of Hellertown's officers and the services of Champion's employees are carried out on behalf of and are attributable to Champion. These activities are a part of Hellertown's corporate activity only insofar as they are necessary to the smooth functioning of the larger economic entity of which Hellertown is a part.

This construct of the Hellertown-Champion arrangement is quite consistent with the manner in which the "parties" themselves apparently conceived of their relationship, since Hellertown was made to "purchase" the management services of Champion for a fee equal to fifteen per cent of the direct cost of labor and materials purchased by Hellertown. I do not believe that those few activities which might be carried on in Hellertown's behalf and which are not part of the services paid for by the management fee, if there are indeed any activities at all which fit this description, constitute the transaction of business outside of the Commonwealth.

## II

Even if it is assumed that Hellertown is entitled to utilize the allocation formula for determining its proper tax burden, I do not believe that any of its receipts are properly characterized as having been "negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer outside of the Commonwealth. . . ." Act of May 16, 1935, P. L. 208, as amended, 72 P.S. §3420b(c)(3). Simply stated, I do not believe that the concepts of negotiation and effectuation

utilized in this section of the allocation formula are applicable to the case at hand, since Hellertown is simply not an independent economic entity. Hellertown does no business with anyone other than Champion, has no bargaining power vis-a-vis Champion, is wholly owned by Champion, is completely subservient to Champion, and does not exist separate from Champion. In sum, Hellertown is Champion, and I would ignore its gossamer corporate veil. The statute itself contemplates situations in which not all three factors of the allocation formula are applicable, and I would therefore allocate Hellertown's income—assuming that allocation is proper—according to the other two factors in the formula.

In this respect the facts of this case are similar to those in *Commonwealth v. Safe Harbor Water Power Corp.,* 83 Dauph. 11, *rev'd on procedural grounds,* 419 Pa. 497, 223 A. 2d 223 (1965). There the Pennsylvania corporation's sole activity was to supply its owners, two out-of-state public utilities, with electrical energy. The amounts of energy to be supplied were determined before the corporation was formed, and the price was fixed periodically by a regulatory body. The original contracts setting up the subsidiary and controlling its operation were negotiated and signed outside of the Commonwealth, and most of the administrative guidance came from outside the Commonwealth. Nevertheless, the trial court concluded, I believe correctly, that the subsidiary's receipts were not properly characterized as having been negotiated or effected outside of the Commonwealth. See also *Commonwealth v. Quaker Oats Co.,* 350 Pa. 253, 38 A. 2d 325 (1944).

In conclusion, it is my view that Hellertown does not transact business outside of the Commonwealth, and that, even if it is found that Hellertown is entitled to utilize the allocation formula, none of Hellertown's receipts are properly seen as having been negotiated or effected outside of the Commonwealth.