## Commonwealth *v.* Western Maryland Railway Company, Appellant.

134

Argued January 18, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Robert D. Myers,* with him *Shearer, Mette & Hoerner,* for appellant.

*George W. Keitel,* Deputy Attorney General, with him *Fred Speaker,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, October 12, 1971:

This is an appeal from the judgment of the Court of Common Pleas of Dauphin County sustaining the action of the Board of Finance and Review which denied appellant's petition for resettlement of its corporate net income tax, Act of May 16, 1935, P. L. 208, §1 *et seq.,* as amended, 72 P.S. §3420a *et seq.,* for the taxable year 1960. Pursuant to the Act of April 22, 1874, P. L. 109, §1, 12 P.S. §688, the matter was presented to the court below on stipulated facts and waiver of trial by jury.

Appellant, Western Maryland Railway Company, a domestic corporation domiciled in both Pennsylvania and Maryland,[1] operates a railroad system with tracks in Pennsylvania, Maryland and West Virginia. In addition, appellant's freight cars moved throughout the United States in accordance with the mandate of the Interstate Commerce Commission, for which appellant receives a per diem charge. Appellant contends that the Commonwealth's allocation of the tangible property fraction and the gross receipts fraction was improper. Turning to a different provision of the Corporate Net Income Tax Act, appellant also argues that the allocation of gain from the sale of destroyed freight cars was erroneous. Following a general discussion of the law in this area, we will examine each of these arguments in detail.

"Under section 2 of section 3420b of the Corporate Net Income Tax Act, the net income of a corpora-

_____

[1] Although appellant originally questioned this characterization in its specifications of objections, this point was not pressed below or on appeal to this Court.

tion transacting part of its business in Pennsylvania and part of its business outside of Pennsylvania is apportioned to Pennsylvania by the use of three fractions, i.e., tangible property, wages and salaries, and gross receipts. Section 2(a) first provides for the specific allocation to Pennsylvania of gains or losses from the sale or exchange of tangible capital assets situated within the Commonwealth. Section 2(b) provides that if such assets are situated without the Commonwealth, that gains or losses therefrom shall not be allocated within Pennsylvania. The remainder of the net income, referred to in tax parlance as 'net income to be allocated,' is then divided into three equal parts. Section 2(c). To each part is applied one of the three fractions heretofore mentioned." *Com. v. Koppers Co., Inc.*, 397 Pa. 523, 525-26, 156 A. 2d 328, 330-31 (1959), *appeal dismissed*, 364 U.S. 286 (1960).

Since appellant's business is interstate and not wholly transacted within this Commonwealth, allocation is necessary for otherwise the Commerce Clause and the Due Process Clause are violated. Such allocation becomes most difficult when dealing with tangible movable property. Abandoning the ancient maxim *mobilia sequuntur personam*—movables have no situs other than the owner's domicile—the Supreme Court, in *Pullman's Palace Car Co. v. Pennsylvania*, 141 U.S. 18 (1891), declared that a nondomiciliary state could levy a capital stock tax upon the Pullman cars used continuously on runs into and through the nondomiciliary state. However, to avoid a multiple tax burden, only that portion of the cars "permanently located"—a legal fiction—in the nondomiciliary state could be taxed. In its opinion, the Supreme Court also ruled that an assessment based on track mileage over which the cars ran within the taxing state compared to total track mileage in all states over which the cars ran correctly proportioned the tax.

138

The second key opinion by the Supreme Court is *New York ex rel. New York Cent. & H. R. R. R. v. Miller,* 202 U.S. 584 (1905). Distinguishing the *Pullman* opinion, an unapportioned tax by the domiciliary state upon a railroad's freight cars was upheld in *Miller* notwithstanding the fact that the cars were also run in other states since, "it [did] not appear that any specific cars or any average of cars was so continuously in any other State as to be taxable there."[2]  202 U.S. at 597. Thus, the *Pullman* and *Miller* cases as well as their progeny establish the two-fold proposition that: (1) a domiciliary state may tax all movables at full value so long as the movables have not acquired an actual situs elsewhere, in which case allocation becomes necessary; and (2) a nondomiciliary state may tax those movables "permanently located" within its boundaries.

These principles were summarized and discussed at length in *Central R. R. v. Pennsylvania,* 370 U.S. 607, 611-13 (1962):

"Since Miller this Court has decided numerous cases touching on the intricate problems of accommodating, under the Due Process and Commerce Clauses, the taxing powers of domiciliary and other States with respect to the instrumentalities of interstate commerce. None of these decisions has weakened the pivotal holding in Miller—that a railroad or other taxpayer owning rolling stock cannot avoid the imposi-

_____

[2] This principle has been refined in a series of cases. *See, Braniff Airways, Inc. v. Nebraska State Board of Equalization,* 347 U.S. 590 (1954); *Standard Oil Co. v. Peck,* 342 U.S. 382 (1952); *Ott v. Mississippi Valley Barge Line Co.,* 336 U.S. 169 (1949); *Northwest Airlines, Inc. v. Minnesota,* 322 U.S. 292 (1944); *Johnson Oil Refining Co. v. Oklahoma,* 290 U.S. 158 (1933); *Southern Pac. Co. v. Kentucky,* 222 U.S. 63 (1911). *See, generally, Developments in the Law—Federal Limitations on State Taxation of Interstate Business,* 75 Harv. L. Rev. 953, 978-87 (1962).

tion of its domicile's property tax on the full value of its assets merely by proving that some determinable fraction of its property was absent from the State for part of the tax year. This Court has consistently held that the State of domicile retains jurisdiction to tax tangible personal property which has 'not acquired an actual situs elsewhere.' Johnson Oil Refining Co. v. Oklahoma, 290 U.S. 158, 161.

"This is because a State casts no forbidden burden upon interstate commerce by subjecting its own corporations, though they be engaged in interstate transport, to non-discriminatory property taxes. It is only 'multiple taxation of interstate operations,' Standard Oil Co. v. Peck, 342 U.S. 382, 385, that offends the Commerce Clause. And obviously multiple taxation is possible only if there exists some jurisdiction, in addition to the domicile of the taxpayer, which may constitutionally impose an ad valorem tax.

"Nor does the Due Process Clause confine the domiciliary State's taxing power to such proportion of the value of the property being taxed as is equal to the fraction of the tax year which the property spends within the State's borders. Union Refrigerator Transit Co. v. Kentucky, 199 U.S. 194, held only that the Due Process Clause prohibited ad valorem taxation by the owner's domicile of tangible personal property *permanently* located in some other State. Northwest Airlines, Inc. v. Minnesota, 322 U.S. 292, reaffirmed the principle established by earlier cases that tangible property for which *no* tax situs has been established elsewhere may be taxed to its full value by the owner's domicile. See New York Central R. Co. v. Miller, supra; Southern Pacific Co. v. Kentucky, 222 U.S. 63, 69; Johnson Oil Refining Co. v. Oklahoma, supra. If such property has had insufficient contact with States other than the owner's domicile to render any one of these jurisdic-

tions a 'tax situs' it is surely appropriate to presume that the domicile is the only State affording the 'opportunities, benefits, or protection' which due process demands as a prerequisite for taxation. See Ott v. Mississippi Valley Barge Line Co., 336 U.S. 169, 174.

"Accordingly, the burden is on the taxpayer who contends that some portion of its total assets are beyond the reach of the taxing power of its domicile to prove that the same property may be similarly taxed in another jurisdiction. Cf. Dixie Ohio Express Co. v. State Revenue Comm'n, 306 U.S. 72.

"The controlling question here is, therefore, the same as it was in Standard Oil Co. v. Peck, 342 U.S. 382, where the decision whether a state property tax might constitutionally be imposed on the full value of a domiciliary's moving assets turned on whether ' "a defined part of the domiciliary corpus" '—there consisting of boats and barges traveling along inland waters—'could be taxed by the several states on an apportionment basis.' 342 U.S., at 384.

"Since the burden of proving an exemption is on the taxpayer who claims it, we must consider whether the stipulated facts show that some determinable portion of the value of the appellant's freight cars had acquired a tax situs in a jurisdiction other than Pennsylvania."

Bearing these precepts in mind, we next address appellant's specific contentions.

### TANGIBLE PROPERTY FRACTION

It will be remembered from our earlier discussion that the tangible property fraction, whatever the ratio, is utilized to determine the amount of a corporation's allocable net income. The pertinent provision of the Act, 72 P.S. §3420b(2)(c)(1), provides: "(c) The remainder of such net income shall be divided into three

equal parts. (1) Of one-third, such portion shall be attributed to business carried on within this Commonwealth, as shall be found by multiplying said one-third by a fraction, whose numerator is the value of the corporation's tangible property situated within this Commonwealth, and whose denominator is the value of all the corporation's tangible property wherever situated."

In the instant appeal, the denominator of this fraction is not contested; only several of the figures, which, when added together, provide the numerator of the tangible property fraction, are questioned. Specifically, appellant contends that the Commonwealth's method of allocation, from which these figures are mathematically derived, is improper. Although the Commonwealth's freight car, work equipment, miscellaneous equipment and locomotive figures are questioned, for the sake of simplicity we will analyze only the freight car figure since the allocation method for all these items is identical.

Briefly summarized, the Commonwealth's initial step of computation distinguishes freight cars "permanently" on or off appellant's three-state system. In this manner, freight cars valued at $25,632,984 are considered to be "permanently" operated in either Pennsylvania, Maryland or West Virginia, and cars valued at $24,730,371 are deemed to be "permanently" operated by other railroads in all other states.[3] Once these

---

[3] The Commonwealth's formula for these figures is as follows:

$$\left( \frac{\frac{\text{Receipts from other railroads}}{\text{Per diem charge}}}{\text{days in tax years x total number of cars}} \right) \times \begin{matrix} \text{Total value} \\ \text{of all cars} \end{matrix} = \begin{matrix} \text{Value of cars} \\ \text{"permanently"} \\ \text{off system} \end{matrix}$$

Employing the appropriate constants and rounding off decimal points:

figures are obtained, a track mileage ratio is employed for purposes of allocation: (1) as to cars "permanently" off the system, a ratio of "first track"[4] miles in Maryland over "first track" miles in Pennsylvania and Maryland is utilized; (2) when dealing with cars "permanently" on the three-state system, a ratio of "all track"[5] miles outside of Pennsylvania over "all track" miles in the entire system is engaged. This computation, in turn, produces two figures representing: (1) the value of freight cars "permanently" off the system and allocable to Pennsylvania; (2) the value of freight cars "permanently" on the system and allocable to Pennsylvania.[6] The addition of these two figures then

$$\left( \frac{\dfrac{\$7,512,373}{\$2.88}}{366 \times 14,514} \right) \times \ \$50,363,353 = \$24,730,371$$

Subtracting this figure ($24,730,371) from the total value of all cars ($50,363,353), we derive the value of cars "permanently" on the system—$25,632,984. (Again, this sum is a round figure.)

[4] The term "first track" miles includes only single track miles of main and branch track *owned*.

[5] The term "all track" miles includes all track *owned, leased or operated*, whether main track, branch track, yard or switching track.

[6] The formula and computation of the value of freight cars "permanently" off the system, allocable to Pennsylvania, is as follows:

$$\begin{array}{l} \text{Total value of cars} \\ \text{"permanently" off} \\ \text{system} \end{array} - \left( \frac{\text{first track miles in Md.}}{\begin{array}{c}\text{first track miles in Pa.} \\ \text{and Md.}\end{array}} \times \begin{array}{l}\text{Value of cars} \\ \text{"permanently"} \\ \text{off system}\end{array} \right) =$$

$$\$24,730,371 - \left( \frac{269.21}{413.59} \times \$24,730,371 \right) = \$8,633,126$$

The formula and computation of the value of freight cars "permanently" on the three-state system, allocable to Pennsylvania, is as follows:

produces the appropriate sum to be included in the numerator of the tangible property fraction. In this appeal, the Commonwealth claims the value of all freight cars allocable to Pennsylvania is $15,292,242, or roughly 30% of the total value of all freight cars owned by appellant.

In stark contrast to the Commonwealth's complex formulae, appellant contends that the allocation of freight car value to Pennsylvania should be directly proportioned to the percentage of railroad track owned, leased or operated by appellant in Pennsylvania compared to the total track mileage owned, leased or operated by appellant in the entire operation, *i.e.,* 26%. While appellant's position must be commended for its simplicity and logic, our duty as a reviewing court is not to substitute our judgment for that of the taxing authorities; instead, we must examine the Commonwealth's formulae to determine whether multiple taxation is the ultimate result. A comparison of the Commonwealth's 30% valuation and appellant's 26% valuation seemingly supports appellant's position at first glance.

Under the *Pullman-Miller* doctrine, it is abundantly clear that appellant's freight cars may be constitutionally taxed only by Pennsylvania, West Virginia and Maryland since the periodic employment of these cars in the remaining states precludes the acquisition of an actual tax situs in any other state which, accordingly, prevents taxation by any other state. Utilizing the

$$\text{Total value of cars ``permanently'' on system} - \left( \frac{\text{all track miles outside Pa.}}{\text{all track miles in entire system}} \times \text{Value of cars on system} \right) =$$

$$\$25,632,984 - \left( \frac{1,016.69}{1,373.51} \times \$25,632,984 \right) = \$6,659,116$$

The total of these two figures is $15,292,242.

*Pullman* opinion, West Virginia, a nondomiciliary state, may levy a tax but only on that percentage of appellant's freight cars which are regularly and continuously run in West Virginia. Maryland, like Pennsylvania, has much broader tax powers: both states, due to their domiciliary status, may levy not only an apportioned tax on the freight cars regularly employed in that state but also an apportioned tax on those freight cars permanently off the three- state system.

The major thrust of appellant's argument is directed towards the Commonwealth's preliminary valuation division of freight cars on or off the three-state system. Although appellant does not set aside certain of its freight cars to be used exclusively on the lines of other railroads, resort to this legal fiction is both wise and practical on these facts. First, this fiction has been recognized and employed by the Supreme Court on many occasions, as evidenced by our earlier discussion. Second, the allocation of income by the various taxing states may be constitutional notwithstanding the overall imposition of a tax on more than 100% of the corporation's income. *E.g., Com. v. General Foods Corp.,* 429 Pa. 266, 275, 239 A. 2d 359, 364 (1968); *Com. v. South Philadelphia Terminal, Inc.,* 404 Pa. 293, 295, 171 A. 2d 758, 759 (1961); *Com. v. Koppers Co., Inc.,* 397 Pa. 523, 530, 156 A. 2d 328, 333 (1959), *appeal dismissed,* 364 U.S. 286 (1960). Moreover, only Pennsylvania and Maryland, the domiciliary states, may constitutionally tax those cars having no taxable situs. Accordingly, there would have to be such a division somewhere in the assessment procedure in order to secure compensation for the domiciliary states' "opportunities, benefits or protection." Of course, there must be a further apportionment between Maryland and Pennsylvania.

## Gross Receipts Fraction

Appellant next attacks the Commonwealth's computation of the gross receipts fraction of the corporate net income tax: "(3) Of the remaining third, such portion shall be attributed to business carried on within the Commonwealth, as shall be found by multiplying said third by a fraction, whose numerator is the amount of the taxpayer's gross receipts from business assignable to this Commonwealth as hereinafter provided, and whose denominator is the amount of the taxpayer's gross receipts from all its business. . . ." 72 P.S. §3420b(2)(c)(3). Appellant contends that two wholly unrelated sums were improperly allocated and included in the numerator of this fraction.

### Receipts from the Use of Freight Cars

During the taxable year 1960, appellant derived gross receipts of $7,512,373, from the usage of its freight cars by other railroads at a per diem rate of $2.88. Employing a first track mile ratio on a two-state domiciliary basis, the Commonwealth allocated and included the sum of $2,622,495, about 35% of total receipts from this source, in the numerator of appellant's gross receipts fraction. As before, the Commonwealth takes the position that the sporadic, discontinuous use of these freight cars in other states causes these freight cars to acquire no tax situs other than the domiciliary states. Again the appellant argues that Pennsylvania may only allocate 26% of the total receipts. We have similarly examined the stipulated figures and we again conclude that the Commonwealth's method of assessment was proper.

Receipts from Freight Shipments

During the tax year in question, appellant generated shipment revenues and included the sum of $11,699,427 in the numerator of the gross receipts fraction. These freight shipments can be divided into two general categories: (1) shipments originating on appellant's lines which are negotiated throughout the three-state system by appellant's freight agents with the shipper; and (2) shipments originating on the lines of some other railroad but moving across appellant's lines which are negotiated *solely at appellant's Baltimore office* between its agent and the agents of the other railroad. Each category represents approximately 50% of appellant's gross freight receipts.

The court below held, and the Commonwealth does not question, that the revenues attributable to the second category are to be excluded from the gross receipts fraction. Since the statute excludes from gross receipts, "those negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at . . . premises for the transaction of business maintained by the taxpayer outside of the Commonwealth," 72 P.S. §3420b (2)(c)(3), we agree with the interpretation by the court below. *See, Com. v. Hellertown Mfg. Co.*, 438 Pa. 134, 264 A. 2d 382 (1970).

In computing the second category, the Commonwealth employed its three-state all track mile formula, *cf.*, footnote 6, *ante*, to derive its figure which assigns 25% of total freight revenues to Pennsylvania. Without introducing any concrete evidence to dispute this figure (appellant's business records for the taxable year 1960 have been destroyed), appellant contends this figure is unrealistic since: (1) retained records for succeeding months and years indicate the percentage of shipments originating in Pennsylvania, while steadily increasing, are nowhere close to the Common-

wealth's 25% figure;[7] and (2) only the rural counties of Adams, Fayette, Franklin, Somerset and York are served in Pennsylvania whereas the metropolis of Baltimore, Maryland, and the coal mines of West Virginia, *inter alia*, are served in the other two states. However, appellant's circumstantial evidence does not, in our opinion, negate the prima facie validity of the assessment established by the Commonwealth's formulae. *Cf., Deitch Co. v. Board of Property Assessment*, 417 Pa. 213, 221-22, 209 A. 2d 397, 402 (1965). In this respect, we adopt the language of the court below: "On the record we cannot say that the method of allocation of gross receipts from freight revenues as employed by the Pennsylvania taxing authorities is violative of the statute. It was appellant's burden to do so in which burden it has failed. So long as there does not exist legally supportable evidence to afford a basis for allocation in and out of Pennsylvania we believe the Pennsylvania apportionment method is a fair and reasonable method of weighing business activity in Pennsylvania as to gross receipts derived from freight revenues."

GAINS FROM THE SALE OF DESTROYED FREIGHT CARS

Turning to a different section of the corporate net income tax, provision is made for the allocation to the Commonwealth of "gains realized . . . from the sale . . . of capital assets if such assets consist of . . . tangible personal property *situated in the Commonwealth. . . .*"

| [7] Period | Originating in Pennsylvania | Originating on other railroads |
|---|---|---|
| January 1961 | 8.362% | 50.955% |
| August 1963 | 12.567% | 52.476% |
| November 1965 | 12.517% | 47.594% |
| Calendar Year 1966 | 14.795% | 46.465% |

(Emphasis added) 72 P.S. §3420b(2)(a). Conversely, such gains from "tangible personal property *situated outside of the Commonwealth,* shall not be allocated in any part to this Commonwealth." (Emphasis added) 72 P.S. §3420b(2)(b). In accordance with its business policy, appellant sold eleven destroyed freight cars in the taxable year 1960 at the place of destruction and realized a net gain of $19,339.76. Two of these cars were destroyed in Pennsylvania and the subsequent sale in this Commonwealth produced a gain of $4,-120.77.

Appellant takes the position that, when these cars were destroyed, they acquired a tax situs in the state of destruction. Accordingly, it is argued that the nine cars destroyed outside of Pennsylvania were "situated outside of the Commonwealth" and any gain is not attributable to the Commonwealth. For this reason appellant contends its taxable gain is only $4,120.77. On the other hand, the Commonwealth allocated the total gain of $19,339.76 on a first track mileage ratio between the domiciliary states of Pennsylvania and Maryland whereby $6,752.00 was assigned to Pennsylvania.

Again we adopt the language of the able opinion of the court below: "While the maxim 'mobilia sequuntur personam' is subject to many exceptions and must give way to reality we believe it to be unrealistic to attach the necessary permanency of situs elsewhere to overcome its application in the instant case because of the happening of an unanticipated and unwanted event. It was clearly not the intent of appellant when the freight cars in question began their journey that they were to acquire permanent situs elsewhere; rather it was intended and anticipated that they would continue to perform their intended purpose of hauling freight either on or off of its system and thus remain a part of the pool of rolling stock. Nor do we believe

that the mere happening of an accident and the resulting sale of the freight cars at the site are in themselves sufficient evidence of permanency of situs to reach the conclusion sought by appellant. On the record before us we conclude that these freight cars having no permanent situs elsewhere were situated in the Commonwealth within the meaning of the statute."

Judgment affirmed.