## Safe Harbor Water Power Corporation *v.* Commonwealth.

Argued January 8, 1973, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Robert R. Batt,* with him *Brian T. Keim* and *Ballard, Spahr, Andrews & Ingersoll,* for appellant.

*George W. Keitel,* Deputy Attorney General, for appellee.

OPINION BY PRESIDENT JUDGE BOWMAN, May 30, 1973:

These tax appeals challenge resettlements of appellant's corporate net income tax liability for the years 1956 and 1957 which were sustained by the Board of Finance and Revenue and provide the basis for the instant appeals.

They are before us upon a stipulation of facts which facts are as follows: appellant, Safe Harbor Water Power Corporation ("Safe Harbor"), a Pennsylvania corporation, was formed in 1930 as the result of a merger and consolidation of Safe Harbor Water Power Corporation (serving the Township of Manor, Lancaster County) and Chanceford Water Power Corporation (serving the Township of Chanceford, York County). The formation of appellant was caused by Consolidated Gas Electric Light and Power Company of Baltimore (now Baltimore Gas and Electric Company, hereinafter referred to as "the Baltimore company") and Pennsylvania Water and Power Company (predecessor to Pennsylvania Power and Light Company, both predecessor and successor hereinafter referred to as "the Pennsylvania company"). Appellant's voting stock was divided equally between the Baltimore and Pennsylvania companies, with the Baltimore company also receiving non-voting stock to reflect its greater investment in appellant.

The Baltimore and Pennsylvania companies originally constituted an electric power system known as the "Aldred System," and in 1927 they were more closely integrated via the execution of a long-term contract under which the Baltimore company became entitled to the entire hydro-electric output of the Pennsylvania company. Appellant was formed as an extension of the Aldred System. During the construction of its generating facilities on the Susquehanna River at Safe Harbor, Pennsylvania, appellant entered into an agreement dated June 1, 1931, effective until April 22, 1980, with the Baltimore and Pennsylvania companies whereby two-thirds of appellant's output was sold to the Baltimore company and one-third was sold to the Pennsylvania company. By the terms of the agreement, the rate of annual payment specified for 1938 and subsequent years was to yield to appellant a return of seven percent on its rate base; this was reduced to five percent in 1946 by the Federal Power Commission. Supplemental agreements dated August 1, 1932, and November 22, 1939, essentially reaffirmed the terms of the 1931 agreement.

Throughout 1931 and for many years thereafter, all three companies maintained their principal offices in Baltimore. Appellant had no executive or administrative office in Pennsylvania until August, 1955, prior to which time its employees in Pennsylvania consisted exclusively of construction, operating and maintenance personnel. Executive officers of appellant had offices in Baltimore and/or New York City until August, 1955. Prior to that date, all legal purchasing, budgeting, engineering, financial, accounting, billing, tax, insurance and other administrative functions of appellant were performed by its Baltimore personnel. The 1931 and supplemental agreements were executed on behalf of appellant by J. A. Walls, originally appellant's vice-president and later its president; negotiations for these

agreements were conducted at the New York and Baltimore offices.

On December 28, 1937, appellant registered with the Maryland State Tax Commission to transact interstate business in Maryland; this registration is still in effect.

In 1940, the Federal Power Commission terminated Aldred control of the Baltimore and Pennsylvania companies. Lacking unified control, the relationship between the two companies deteriorated to the point of continuous litigation between them, commencing in 1948. This litigation was finally resolved on June 1, 1955, at which time the following events occurred:

(1) Pennsylvania Water and Power Company merged into Pennsylvania Power and Light Company.

(2) The Baltimore and Pennsylvania companies entered into a new agreement with appellant superseding the 1931 agreement, but continuing the sale of two-thirds of appellant's electric energy to the Baltimore company and one-third to the Pennsylvania company, said terms to be in effect until April 22, 1980.

(3) Appellant engaged the services of Stone & Webster Service Corporation; among these services were the appointment of an individual to serve as president and board chairman of appellant and the appointment of others to serve as vice-president, assistant secretary and assistant treasurer. This management agreement has been renewed annually since.

Negotiations for this 1955 agreement had been proceeding for several years. Participating therein were three directors of appellant with offices in Baltimore. Two of these individuals were also employed by the Baltimore company; the third was also employed by the Pennsylvania company. Appellant had no interest in the outcome of these negotiations, the principal issue being the division of appellant's electric energy output between the Baltimore and Pennsylvania companies.

The management contract with Stone & Webster was intended to vest the management of appellant in persons independent of the two corporate shareholders. Stone & Webster selected one of its vice-presidents, F. W. Utz, to serve as president and board chairman of appellant. Mr. Utz executed the 1955 agreement on behalf of appellant.

During the year 1956, appellant paid or accrued to Stone & Webster $49,654.05 of which $22,916.67 constituted five-twelfths of the first yearly fee[1] of $55,000.00 pursuant to the 1955 agreement; $26,250.00 constituted seven-twelfths of the regular yearly fee of $45,000.00; the balance represented reimbursement of expenses incurred. During the year 1957, appellant paid or accrued to Stone & Webster $45,274.27, of which $45,000.00 represented the regular yearly fee and the balance represented reimbursement of expenses incurred.

After June 1, 1955, appellant had its name listed in the New York City telephone directory and on the building directory at 90 Broad Street, New York City, where its engineering and executive offices were located on the nineteenth floor. Stone & Webster occupied seven floors at the same location, including the nineteenth floor. These offices included those of the individuals appointed by Stone & Webster to serve as president and vice-president of appellant commencing June 1, 1955.

In August, 1955, appellant closed its Baltimore office. Most of the "general office routine" was transferred to appellant's office in Safe Harbor, Pennsylvania, where it has since been performed by a maximum of nine employees as directed by appellant's treasurer. The other four officers of appellant have headquarters at the New York address where appellant has been

---

[1] $2,000.00 of the annual fee was a rental charge according to the 1955 agreement.

directed since June 1, 1955, and where all financial operations have been handled. Certain engineering, accounting, insurance and tax functions formerly performed in Baltimore were assumed by Stone & Webster at the New York address and have been performed under the supervision of appellant's four officers.

As of December 29, 1955, appellant was registered in the State of New York as a foreign corporation doing business in New York.

In its corporate net income tax report for 1956, which was timely filed, appellant reported $3,818,867.64 as total gross receipts. Federal taxable income was reported to be $1,809,073.09 of which $1,193,894.00 was allocated to Pennsylvania based on an allocating percentage of .659947910.[2] The six percent tax was calculated to be $71,633.64.

Appellant excluded from the numerator of the wages and salaries fraction $20,000.00 which comprised that portion of the fee to Stone & Webster for 1956 for officers' salaries pursuant to the 1955 agreement. Excluded from the numerator of the gross receipts fraction was $3,790,912.06 of which $3,750,405.47 was the net amount accrued by appellant as income for 1956 with

---

[2] This percentage was computed as follows:

| | | |
|---|---|---|
| Average value of tangible property in Pa. | $24,599,983.78 | |
| Average value of all tangible property | $24,599,983.78 | = 1.000000000 |
| Wages, salaries, etc. assignable to Pa. | $ 707,890.70 | |
| Total wages, salaries, etc. | $ 727,890.70 | = .972523347 |
| Gross receipts assignable to Pa. | $ 27,955.58 | |
| Gross receipts from all business | $ 3,818,867.64 | 3) 1.979843732 |

.659947910

regard to electric energy sales to the Baltimore and Pennsylvania companies and $40,506.59 constituted interest received by appellant.

For its 1957 corporate net income tax report, which was timely filed, appellant declared gross receipts of $3,759,385.00. Federal taxable income was $1,767,871.19 of which $1,168,036.19 was allocated to Pennsylvania based on an allocating percentage of .660793500.[3] The six percent tax was determined to be $70,082.17.

Appellant excluded from the numerator of the wages and salaries fraction $20,000.00 for that portion of the fee to Stone & Webster for officers' salaries. The amount of $3,728,195.00 was excluded from the numerator of the gross receipts fraction, all of which was attributed to the sale of electric energy to the Baltimore and Pennsylvania companies.

On February 18, 1959, the Department of Revenue mailed to appellant copies of settlements of its corporate net income tax liability for 1956 and 1957. With the subsequent approval of the Auditor General (on November 18, 1958), the Department of Revenue on October 27, 1958, had settled the 1956 tax liability in the amount of $108,544.39, based on appellant's entire

---

[3] This figure was computed as follows:

| | | |
|---|---|---|
| Average value of tangible property in Pa. | $24,108,924.00 | |
| | | = 1.000000000 |
| Average value of all tangible property | $24,108,924.00 | |
| Wages, salaries, etc. assignable to Pa. | $ 751,722.00 | |
| | | = .974083931 |
| Total wages, salaries, etc. | $ 771,722.00 | |
| Gross receipts assignable to Pa. | $ 31,190.00 | |
| | | = .008296569 |
| Gross receipts from all business | $ 3,759,385.00 | 3) 1.982380500 |
| | | .660793500 |

net income of $1,809,073.09 without apportionment. Appellant's 1957 tax liability was settled in a similar manner in the amount of $106,057.60 based upon the entire net income of $1,767,626.63. In response to appellant's petitions for resettlement, appellant's 1956 and 1957 corporate net income tax liability was reset at $107,552.23 and $105,141.37 respectively. Copies of the resettlements were mailed to appellant on November 20, 1959. The resettlements were determined with the elimination from the numerator of the wages and salaries fraction of the wages and salaries paid by appellant to its officers located in its New York office.

On April 19, 1960, the Board of Finance and Revenue refused appellant's timely filed petitions for review of its corporate net income tax liability for the years 1956 and 1957.

The Commonwealth contends that appellant is entitled to no apportionment in computing its corporate net income tax liability; thus, appellant's entire net income is subject to the tax.

Appellant supports tax liability based on its 1956 and 1957 corporate net income tax returns as timely filed.

There are two major issues to be resolved. The first is whether or not the Commonwealth timely settled the appellant's corporate net income tax liability for the year 1956. The second issue is what, if any, income of appellant was entitled to apportionment outside Pennsylvania (including 1956 if the settlement was timely).

Section 8 of the Corporate Net Income Tax Act, Act of May 16, 1935, P. L. 208, as amended, 72 P.S. §3420h,* provides in part:

"(a) All taxes due under this act shall be settled by the department, and such settlement shall be sub-

---

* Repealed by the Tax Reform Code of 1971, Act of March 4, 1971, P. L. 6, 72 P.S. §7101 et seq.

ject to audit and approval by the Department of the Auditor General, and shall, *so far as possible,* be made so that notice thereof may reach the taxpayer before the end of a year after the tax report was required to be made.

"(b) Promptly after the date of any such settlement, the department shall send, by mail or otherwise, a copy thereof to such corporation. . . ." [Emphasis added.]

The facts, as stated above, indicate that Safe Harbor timely filed its corporate net income tax report for the year 1956—it was, thus, received by April 15, 1957. The language of the act requires the Commonwealth to have notified appellant as to its tax liability by April 15, 1958, but, in fact, it was not settled until October 27, 1958, and the Commonwealth did not mail a copy of this settlement to appellant until February 18, 1959, not quite two years after the tax report was filed. The Commonwealth explains this delay by its practices of pairing the current tax report with the report for the preceding year and of comparing the tax report of a parent company with those of its subsidiaries when taxing "a system."

In resolving the dispute over this appellant's 1955 corporate net income tax liability, the Supreme Court in *Commonwealth v. Safe Harbor Water Power Corporation,* 423 Pa. 101, 105, 223 A. 2d 223, 226 (1966), stated that "the only general basis for excusing a late settlement is when the taxpayer does something to delay timely action." Beyond this preliminary guideline, the Court took note of certain principles applicable to tax cases wherein timeliness of settlement is at issue. In essence, these were as follows:

(1) The burden is upon the Commonwealth to explain why a late settlement should not be held invalid.

(2) The phrase "so far as possible" in §8 of the Act (72 P.S. §3420h(a)) justifies allowing the Commonwealth to explain a tardy settlement and excuses the Commonwealth where certain circumstances caused the lateness of settlement.

(3) The justificatory circumstances are to be determined on a case-by-case basis. These aspects of *Safe Harbor* were recently approved in *Commonwealth v. Wanamaker,* 450 Pa. 77, 296 A. 2d 618 (1972).

The Court went on to reject "pairing" absolutely—whether of two successive tax reports or of parent-subsidiary reports—as an excuse for tardy settlement. Thus, the mandatory time limit of §8 of the Corporate Net Income Tax Act, 72 P.S. §3420h, could not be disregarded.

Since the only excusatory circumstances presented by the Commonwealth have been specifically rejected by the Supreme Court, we hold that the Commonwealth's late settlement of Safe Harbor's 1956 corporate net income tax liability was in violation of the statute, and, therefore, appellant's tax report for that year must be accepted as filed.

The second issue is somewhat more complex. Section 2 of the Corporate Net Income Tax Act, 72 P.S. §3420b,* provides:

"2. In case the entire business of any corporation . . . is not transacted within this Commonwealth, the tax imposed by this act shall be based upon such portion of the net income of such corporation . . . as may be determined by allocations and apportionments made as follows: . . .

"The amount assignable to this Commonwealth of expenditures of the corporation for wages, salaries, commissions, or other compensation to its employes, shall be such expenditures for the taxable year as rep-

---

* Also repealed, *supra.*

resent the wages, salaries, commissions, or other compensation of employes, not chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the corporation outside the Commonwealth.

"The amount of the corporation's gross receipts from business assignable to this Commonwealth shall be, (1) the amount of its gross receipts for the taxable year except those negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer outside of the Commonwealth, and except rentals and royalties, and interest and dividends. . . ."

As provided by the statute, the extent of a corporation's business activity in Pennsylvania is measured by the three apportionment fractions detailed in footnotes 2 and 3, *supra*: (1) tangible property, (2) wages, salaries, commissions and other compensation, and (3) gross receipts. The instant case concerns only the latter two.

The first obstacle appellant must surmount is establishing that its entire business was not transacted within Pennsylvania for the year 1957. Case law supports the appellant in its contention. Safe Harbor's New York office clearly was the "nerve center" of its operations. As was said in *Commonwealth v. Hellertown Manufacturing Company*, 438 Pa. 134, 147, 264 A. 2d 382, 389 (1970), concerning a parent-subsidiary relationship and the tax liability of the latter, "The office itself is real, fulfills a genuine purpose in adjusting functions between parent and subsidiary and actually serves as the nerve center of Hellertown's [the subsidiary] operations." The test of transacting business as enunciated in *Hellertown* was, as appellant here argues, a practical one: "If the taxpayer is present (e.g. through *administrative functioning,* property owner-

ship or sales activity) in some fashion outside of Pennsylvania and if this presence is related to its actual business activity, it is transacting business outside of Pennsylvania. . . . Here it is unquestioned that Hellertown's administrative machinery and executive policies are operated and established by its officers at Toledo, Ohio. These activities are as essential to Hellertown's manufacturing activity as are the actual production operations at its plant and are equally a part of its 'business.' " [Emphasis added.] *Hellertown, supra,* 438 Pa. at 141, 264 A. 2d at 386. Although the instant case does not involve a parent-subsidiary relationship (i.e., the relationship of appellant and Stone & Webster), we believe that the *Hellertown* principle is applicable. Given the management decisions, financial operations, and certain engineering, accounting, insurance and tax functions performed in New York since 1955, to say that appellant transacted its entire business within the Commonwealth in 1957 or that the business transacted in New York was merely incidental or marginal in nature, is to completely disregard the complexities and realities of contemporary corporate functioning. In appellant's 1955 tax liability case, the lower court reached the same conclusion: ". . . [W]hile the production of electric power, the principal corporate purpose of appellant, was performed in Pennsylvania, many other equally important facets of the business were performed elsewhere. . . . We conclude on the facts of the instant case the 'entire business of . . . [this] corporation . . . is not transacted within this Commonwealth,' and therefore appellant may use the allocation percentages in arriving at the tax due." *Commonwealth v. Safe Harbor Water Power Corp.,* 83 Dauph. 11, 19, 21 (1964), *rev'd on other grounds, Commonwealth v. Safe Harbor Water Power Corporation,* 419 Pa. 497, 223 A. 2d 223 (1965), *aff'd on reargument, Commonwealth v. Safe Harbor Water Power Corporation, supra.* Safe Harbor

is entitled to apportionment of its income in determining its 1957 tax liability.

Since appellant is so entitled, it must next substantiate its computation of the gross receipts allocation fraction.[4]

Crucial to the assignability of wages, salaries, et al. and gross receipts is the interpretation of the phrase "premises for the transaction of business maintained by the corporation outside the Commonwealth." Having discussed the Supreme Court's view as to what the transaction of business includes, we must construe the word "maintained." Our work is simplified by the Supreme Court which in *Hellertown* stated, "[I]t would seem that if the taxpayer in some way (and there may be many ways) is wholly or partly responsible for the presence or upkeep of premises outside of Pennsylvania, it has met the statutory test regardless of the form of the arrangement." 438 Pa. at 142, 264 A. 2d at 387. The Court concluded "that where part of a corporation's own business activity is carried on at a defined location and where that corporation reimburses or otherwise pays the actual owner or lessee a fee for the latter's services to it at that location, the corporation is participating in the maintenance of those premises because it is, at least in part, responsible for the upkeep of those premises." 438 Pa. at 146, 264 A. 2d at 388. As stated above in our description of the facts of the case at bar, the 1955 agreement between Safe Harbor and Stone & Webster provided that $2,000.00 of the annual fee "cover[ed] annual rent for the offices provided for such officers."

---

[4] Although appellant's allocation of wages and salaries outside of the Commonwealth was recognized on resettlement, counsel for both sides have argued this point both orally and in their briefs. Apparently this issue is now before us via Section 1104 of the Act of April 9, 1929, P. L. 343, 72 P.S. §1104, as amended by the Act of May 15, 1945, P. L. 528, and the Act of April 25, 1949, P. L. 745.

Relevant to this issue is the "nerve center" criterion referred to previously with regard to our exposition of what constitutes the transaction of business. When substantial rent is paid for a "nerve center" where a significant part of a corporation's business is transacted, this satisfies the case law definition of "maintained." *Hellertown, supra,* 438 Pa. at 143, 264 A. 2d at 387. *See also Blumenthal Brothers Chocolate Company v. Commonwealth,* 5 Pa. Commonwealth Ct. 344, 291 A. 2d 347 (1972).

Thus, the salaries, wages, et al., of the four officers of appellant with offices in New York City are not assignable to Pennsylvania and must, therefore, be excluded from the numerator of the appropriate fraction which apparently was done by the Department of Revenue in the resettlement for 1957.

The remaining question concerns the assignability of gross receipts. All gross receipts are assignable to the Commonwealth except those "negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from premises for the transaction of business maintained by the taxpayer outside of the Commonwealth. . . ." Since we have already discussed the "maintenance of premises" and "transaction of business" problems, all that remains is to resolve the meaning of "negotiated or effected" and its application to the appellant's situation. Our reading of the current case law compels us to hold that no gross receipts of appellant in 1957 were "negotiated or effected" outside the Commonwealth. Although we agree that a parent-subsidiary relationship is not a bar to a taxpayer's entitlement to allocation, the nature of Safe Harbor's creation and existence would require too great a stretching of the meaning of "negotiated or effected." We recognize that "[m]odern techniques of communication and transportation have transformed methods sufficiently that traditional con-

cepts of 'negotiated or effected' may necessarily be inappropriate to determine all cases." *Commonwealth v. General Foods Corporation*, 429 Pa. 266, 280, 239 A. 2d 359, 366-67 (1968). However, as the Court then stressed, "Nevertheless, these two words remain the operative ones of the statute. . . ." 429 Pa. at 280, 239 A. 2d at 367. The analysis of the Court in *Hellertown, supra,* 438 Pa. at 150-51, 264 A. 2d at 390-91, as to the meaning of "negotiated or effected" supports the nonapplicability of this phrase to the 1957 gross receipts of appellant. We believe that these words were intended to apply to agreements to buy and sell between customer and seller. A fifty year contract whereby the electric energy output of a Pennsylvania corporation from the time it is created is divided between its parent corporations does not produce yearly gross receipts which can be said to have been "negotiated or effected" outside of the Commonwealth.[5] This is consonant with the "basic rule that allocation reflect corporate activity in Pennsylvania. . . ." *Hellertown, supra,* 438 Pa. at 151, 264 A. 2d at 391. Thus, appellant is not entitled to allocate outside of the Commonwealth any gross receipts received for the year 1957.

Accordingly, we enter the following

## ORDER

Now, May 30, 1973, the appeal of Safe Harbor Water Power Corporation from the decision of the Board of Finance and Revenue sustaining resettlement of its 1956 corporate net income tax liability is sustained because of untimely settlement thereof by the taxing authorities. Its appeal from the decision of the Board of Finance and Revenue sustaining resettlement of its 1957 corporate net income tax liability, which

---

[5] The lower court in appellant's 1955 tax liability case reached this same conclusion. 83 Dauph. at 22-24.

328

recognized allocation of wages and salaries but denied allocation of gross receipts, is dismissed.

Unless exceptions hereto are filed within thirty (30) days of this Order, the Chief Clerk is directed to enter judgment as follows:

(1) in favor of Safe Harbor Water Power Corporation and against the Commonwealth in the form of a tax credit in the amount of $35,916.59, being the difference between appellant's 1956 corporate net income tax liability as disclosed by its return and the amount of tax paid on account thereof;

(2) in favor of the Commonwealth and against Safe Harbor Water Power Corporation in the amount of $105,141.37 as its 1957 corporate net income tax liability, which judgment shall be marked satisfied as having been paid by appellant on account thereof.

The Chief Clerk is directed to notify the parties or their counsel of this order forthwith.