## Commonwealth *v.* Safe Harbor Water Power Corp., Appellant.

Argued May 22, 1974.  Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused December 17, 1974.

*Robert R. Batt,* with him *Brian T. Keim,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellant.

*George W. Keitel,* Deputy Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, October 16, 1974:

Safe Harbor Water Power Corporation appeals from a unanimous order of the Commonwealth Court that determined Safe Harbor's 1957 corporate net income tax liability to be $105,141.37.[1] The court found all of Safe Harbor's 1957 gross receipts to be assignable to Pennsylvania and properly taxable. *Safe Harbor Water Power Corp. v. Commonwealth,* 9 Pa. Commonwealth Ct. 312, 305 A.2d 394 (1973). We agree and affirm.[2]

The case was tried nonjury before the Commonwealth Court en banc pursuant to a stipulation of facts.[3] Relevant portions of the record stipulation disclose:

[1] Safe Harbor is a Pennsylvania corporation with hydroelectric generating facilities located in Lancaster and York counties. Appellant is also registered to do business in Maryland and New York. However, no income or gross receipts taxes have been paid in either of those states for the tax year in question.

[2] Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 203, 17 P.S. § 211.203 (Supp. 1974).

[3] The stipulated facts and exhibits constitute the entire record and are binding upon both the taxpayer and the Commonwealth. *Anastasi Bros. Corp. v. Commonwealth,* 455 Pa. 127, 131-32, 315 A.2d 267, 270 (1974); *Commonwealth v. Carheart Corp.,* 450 Pa. 192, 195-96, 299 A.2d 628, 630-31 (1973).

The burden of proving error in the Commonwealth's resettlement is on the taxpayer. *Commonwealth v. General Foods Corp.,* 429 Pa. 266, 281, 239 A.2d 359, 367 (1968); *Commonwealth v. Stretchnit, Inc.,* 2 Pa. Commonwealth Ct. 270, 273, 273 A.2d 750, 751 (1971).

"[Safe Harbor], a Pennsylvania corporation, was formed in 1930 as the resulting corporation in the merger and consolidation of Safe Harbor Water Power Corporation and Chanceford Water Power Corporation. . . .

"The formation of [Safe Harbor] as aforesaid was caused by Consolidated Gas Electric Light and Power Company of Baltimore (now Baltimore Gas and Electric Company and hereinafter referred to as 'the Baltimore company') and Pennsylvania Water and Power Company (predecessor to Pennsylvania Power and Light Company, both predecessor and successor being referred to hereinafter as 'the Pennsylvania company'). . . .

"The Baltimore company and the Pennsylvania company originally constituted the so-called 'Aldred System', i.e., the electric power system controlled by J.E. Aldred, controlling partner of the New York investment banking firm of Aldred & Company. In 1927, under the direction of Mr. Aldred as Chairman of the Board of the Baltimore and Pennsylvania companies, the two companies were more closely integrated through the execution of a long-term contract under which the Baltimore company became entitled to the entire hydroelectric output of the Pennsylvania company.

"[Safe Harbor] was formed as an extension of the Aldred System. On June 27, 1931, during the construction of its generating facilities on the Susquehanna River at Safe Harbor, Pennsylvania, [Safe Harbor] entered into an agreement with the Baltimore company and the Pennsylvania company, dated June 1, 1931 and providing for the sale of two-thirds of its output to the Baltimore company and one-third to the Pennsylvania company. This agreement . . . was by its terms to remain in force until April 22, 1980. . . .

"The rate of annual payment called for under Article V of the 1931 Agreement, specified for 1938 and subsequent years to be such as to yield to [Safe Harbor]

a return of seven percent on its rate base, was reduced to five percent in 1946 pursuant to order of the Federal Power Commission.

"Throughout 1931 and for many years thereafter, (in the case of [Safe Harbor] until August, 1955), all three companies maintained their principal offices in the Lexington Building in Baltimore, Maryland. During the month of June, 1931, [Safe Harbor] occupied twenty-four rooms in the said building under lease from the Baltimore company as owner-lessor, for which [Safe Harbor] paid an aggregate monthly rental of $1,-817.50. . . ."

The Corporate Net Income Tax Act[4] imposed a tax on the privilege of doing business in the Commonwealth. See *Commonwealth v. General Foods Corp.*, 429 Pa. 266, 274, 239 A.2d 359, 364 (1968). When a corporation transacted business both within and without Pennsylvania, the Act provided for fractions to apportion the taxpayer's tangible property, wages, and gross receipts allocable to Pennsylvania.

"The gross receipts fraction, as well as the tangible property and wages and salaries fractions, is part of a method used to apportion the income of a corporation doing business in more than one state so that each state may base its tax on only a portion of the income, a portion considered allocable to that state. . . . [A]ll three fractions are designed as measures of corporate activity in the taxing state." *Commonwealth v. Koppers Co.*, 397 Pa. 523, 530-31, 156 A.2d 328, 333 (1959), appeal dismissed, 364 U.S. 286, 81 S. Ct. 43 (1960).

The apportionment method of determining net income derived from business conducted within Pennsyl-

---

[4] Corporate Net Income Tax Act, Act of May 16, 1935, P.L. 208, § 2(2)(c)(3)(1). The Act of 1935 was amended several times and finally repealed and replaced by the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 72, No. 2, art. IV, §§ 401-12, as amended, 72 P.S. §§ 7401-12 (Supp. 1974).

vania operates in a just and equitable manner to ensure that no corporation escapes paying its fair share, and

The amended 1935 Act provided that when the "entire business" of a corporation is not transacted in Pennsylvania, the corporation should apportion its income by use of a three-part formula. The apportionment formula is illustrated below.

| Formula | Safe Harbor's 1957 Computation | Computation pursuant to Commonwealth Court's order |
|---|---|---|
| 1. Average value of tangible property in Pa. | $24,108,924.00 | $24,108,924.00 |
| Average value of all tangible property | $24,108,924.00 = 1.000000000 | $24,108,924.00 = 1.000000000 |
| 2. Wages, salaries, etc. assignable to Pa. | $ 751,722.00 | $ 751,722.00 |
| Total wages, salaries, etc. | $ 771,722.00 = .974083931 | $ 771,722.00 = .974083931 |
| 3. Gross receipts assignable to Pa. | $ 31,190.00 | |
| Gross receipts from all business | $ 3,759,385.00 = .008296569 | $ 3,759,385.00 = 1.000000000 |
| | 3)1.982380500 | 3)2.974083931 |
| Portion of net income allocable to Pennsylvania | .660793500 | .991361310 |
| x Federal taxable income | $1,767,871.19 | $1,767,871.19 |
| Pa. taxable income | $1,168,197.79 | $1,750,369.27 |
| x 6% tax rate | .06 | .06 |
| TAX | $ 70,082.17 | $ 105,141.37 |

conversely, that no corporate taxpayer pays more than this fair share. Nevertheless, in interpreting the provisions of the tax statutes we must be guided by the realities of the particular business transaction. As we noted in *Commonwealth v. Hellertown Manufacturing Co.*, 438 Pa. 134, 151, 264 A.2d 382, 391 (1970) : "Subject to the basic rule that allocation reflect corporate activity in Pennsylvania, we must rely upon the Act to guide us." Thus the guiding principle in our interpretation of the Act must be the accurate reflection of in-state corporate activity in each taxpayer's return.

During 1957 all of Safe Harbor's tangible property was located in Pennsylvania. And ninety-seven percent of the corporation's total 1957 wages were paid to Pennsylvania-based employees. Yet Safe Harbor contends that only sixty-six percent of its net income may be taxed because, by its calculation, a mere eight-tenths of one percent of its 1957 gross receipts are allocable to this Commonwealth. The major portion of its gross receipts, the taxpayer argues, are allocable outside of Pennsylvania because "negotiated or effected" there.

We agree with Safe Harbor that all its 1957 gross receipts are attributable to the 1931 agreement.[5] How-

---

Here the Commonwealth Court decided that Safe Harbor's entire business was not transacted in Pennsylvania and that apportionment was proper. *Safe Harbor Water Power Corp. v. Commonwealth*, 9 Pa. Commonwealth Ct. 312, 324-25, 305 A.2d 394, 400 (1973). The court also decided that Safe Harbor's computation of one part of the allocation formula—wages—was correct. The Commonwealth has not appealed either of these judgments. Another part of the formula was not in dispute; Safe Harbor admitted that 100% of its tangible property was located in Pennsylvania. The final horse in the allocation troika—the gross receipts fraction—is the only issue which the Commonwealth Court decided adversely to Safe Harbor, and the only issue before us on this appeal. See id. at 326-27, 305 A.2d at 401-02.

[5] Although the parties on June 1, 1955, entered into an agreement of a similar nature this later agreement made no change in

ever, we cannot accept the taxpayer's contention that by executing a contract in 1931 and retaining a management firm to provide corporate officers and hold stockholders' meetings it may for the life of the contract allocate over ninety-nine percent of its gross receipts outside Pennsylvania. For the record clearly indicates that the 1957 gross receipts are not allocable outside the Commonwealth. This conclusion follows from both a realistic appraisal of the nature and extent of Safe Harbor's extraterritorial business and the explicit language of the tax statute.

The statutory question is whether the 1931 agreement by which appellant disposed of its entire output for fifty years, was "negotiated or effected in behalf of the corporation by agents or agencies chiefly situated at, connected with, or sent out from, premises for the transaction of business maintained by the taxpayer outside of the Commonwealth . . . ." Safe Harbor contends that it has met all the statutory requisites for allocation and that it may properly exclude all gross receipts arising from the 1931 agreement—more than ninety-nine percent of its 1957 gross receipts. The Commonwealth argues that all of Safe Harbor's 1957 gross receipts are taxable in Pennsylvania.

The statute is a conglomerate of several distinct requirements. Failure to prove any one is fatal to a taxpayer's attempt to exclude gross receipts. The Commonwealth Court found the long-term nature of the 1931 contract and the close relationship of the parties precluded a finding that the agreement had been "negotiated or effected."

This is the same reasoning employed by the Court of Common Pleas of Dauphin County in adjudicating appellant's 1955 corporate net income tax liability. *Commonwealth v. Safe Harbor Water Power Corp.*, 35 Pa.

the terms of the 1931 agreement and merely restated the terms and conditions of the longstanding arrangement between the parties.

D. & C.2d 207 (C.P. Dauphin County 1964) (Commonwealth docket), rev'd on other grounds, 423 Pa. 101, 223 A.2d 223 (1966). Without reaching this substantive question of statutory interpretation, we reversed the trial court's judgment because of the Commonwealth's failure to settle the taxpayer's return within the statutorily-mandated settlement period.

Safe Harbor nevertheless contends that the analysis employed by the Commonwealth Court in the instant case was discredited by this Court in *Commonwealth v. Hellertown Manufacturing Co.*, supra. We need not however address the "negotiated or effected" question for the record establishes that when the agreement embodied in the 1931 contract was reached, Safe Harbor maintained no "premises for transaction of business . . . outside of the Commonwealth."[6]

That in 1957 Safe Harbor maintained an office for the transaction of business in New York City is not challenged. The Commonwealth Court found this to be so and permitted allocation of wages and salaries paid in 1957 to New York employees.[7] However, in determining whether the gross receipts arising from a contract may be assigned outside Pennsylvania, the "premises for the transaction of business maintained by the taxpayer outside of the Commonwealth" must have been maintained when the contract was "negotiated or effected."[8] *Commonwealth v. General Foods Corp.*, 429

---

[6] We may affirm a correct decision for a reason other than that advanced by the lower court. *Prynn Estate*, 455 Pa. 192, 197 n.9, 315 A.2d 265, 267 n.9 (1974) ; *Concord Township Appeal*, 439 Pa. 466, 469, 268 A.2d 765, 766 (1970) ; *Ridley Township v. Pronesti*, 431 Pa. 34, 37, 244 A.2d 719, 720-21 (1968) ; *Sherwood v. Elgart*, 383 Pa. 110, 117 A.2d 899 (1955).

[7] See note 4 supra.

[8] Because the record establishes that during the critical period preceding the execution of the 1931 agreement Safe Harbor did not maintain an office outside Pennsylvania, we need not decide whether the agreement was "negotiated or effected" in the statutory sense.

Pa. 266, 280-81, 239 A.2d 359, 367 (1968); *Commonwealth v. Electric Storage Battery Co.*, 51 Dauphin County Reports 90 (Pa. C.P. 1941) (Commonwealth docket). See also *Commonwealth v. Continental Rubber Works*, 347 Pa. 514, 32 A.2d 878 (1943). Thus the Commonwealth Court's finding that Safe Harbor maintained an office for the transaction of business in New York City in 1957 is irrelevant to the question before us—because the critical period is 1928 to 1931.[9]

The stipulated facts clearly indicate that Safe Harbor was formed at the instigation of the Baltimore Com-

---

[9] The nature of the 1931 agreement reinforces our conclusion. Here a fifty-year output contract with price set for the term of the agreement and terms of delivery definitely determined was negotiated before 1931. After the execution of the agreement, no bargaining could take place. The operative period for determining whether the agreement was "negotiated or effected" at taxpayer's business office is some time prior to 1931.

In *Commonwealth v. Hellertown Mfg. Co.*, 438 Pa. 134, 264 A.2d 382 (1970), on the other hand, the initial understanding between parent and subsidiary corporation was only a part of the agreement by which sales of spark plugs were "negotiated or effected." Originally Hellertown agreed to sell its output to Champion. But, the actual determination of how many spark plugs were to be sold and what the price would be was made as each order was placed. Each year there was negotiation (or rather renegotiation) of the terms of the contract for that year. We stated: "It is apparent from the record that all basic arrangements between the parties were made at Toledo by the joint officers of the two companies. These arrangements include both the initial understanding that Hellertown would sell all of its output to Champion and subsequent pricing adjustments and placements of orders. . . . The most important Hellertown-Champion contact is the actual shipping instructions issued by the latter to the former in each case; even if this be considered as the final step in the making of a sale, it is one which emanates from Toledo and only reinforces the out-of-state factors. In short, we find that the facts here support Hellertown's position that an out-of-state allocation is justified." Id. at 152-53, 264 A.2d at 392.

Therefore the relevant question was whether during the tax year in question, when the sales were actually negotiated and effect-

pany and the Pennsylvania Company specifically for the purpose of entering into what eventually became the 1931 agreement. At that time both corporations were controlled by J. E. Aldred. To create Safe Harbor the Aldred companies arranged the merger of two subsidiary companies. The merger agreement was executed on April 16, 1929, in Lancaster County, Pennsylvania by two Pennsylvania corporations—"Safe Harbor Water Power Corporation, of Holtwood, Lancaster County, Pennsylvania" and "Chanceford Water Power Corporation, of Holtwood, Lancaster County, Pennsylvania." The stipulation does not suggest that either of appellant's corporate predecessors maintained business offices outside Pennsylvania.

J. A. Walls, a moving force in the creation, and once president of Safe Harbor, submitted an affidavit which was incorporated into the stipulation of facts. Mr. Walls stated that planning for the formation of Safe Harbor began prior to and ended in 1929.

"The decision to proceed with the construction of such [generating] facilities, and to do so through the medium of a separate corporation the stock of which would belong in part to the Pennsylvania company and in part to [the Baltimore company] . . . was reached in 1929 as the result of discussions among Mr. J. E. Aldred of New York City and Mr. Herbert A. Wagner and myself, both of Baltimore, Maryland." Mr. Walls also stated that Safe Harbor "was formed in 1930 as the instrumentality for the erection and operation of the generating facilities" and did not establish its executive offices in Baltimore until some unspecified time that year.

These stipulated facts show that Safe Harbor was formed after negotiations which, by its president's re-

---

ed, Hellertown maintained a business office outside Pennsylvania. We found that it did and concluded that allocation was justified. See id.

call, began prior to 1929. From 1929 (when the final decision to create Safe Harbor was made) to June 27, 1931 (when the agreement was signed) discussions continued. It was not until some time in 1930, however, that Safe Harbor opened its business office in Baltimore.

Gross receipts are not "negotiated or effected" at the moment a formal contract is signed. In *Commonwealth v. Electric Storage Battery Co.*, 51 Dauphin *County Reports* 90, 95 (Pa. C.P. 1941) (Commonwealth docket), a Pennsylvania company assigned its representative to an office it maintained in New York City. While in the process of negotiating a contract, the representative moved to Philadelphia where the contract was finally executed. The court refused to deem determinative the formal signing of the contract, but rather functionally viewed the entire range of discussions and concluded that the contract was "negotiated or effected" outside Pennsylvania. The extent of the negotiations conducted from the New York office, the court held, brought the gross receipts within the statutory exclusion.[10] Similarly, we have defined "effected" to mean "accomplished" or "brought about." *Commonwealth v. Quaker Oats Co.*, 350 Pa. 253, 259-60, 38 A.2d 325, 328 (1944), appeal dismissed, 324 U.S. 827, 65 S. Ct. 857 (1945).

The stipulated facts do not assign any particular moment between 1929 and 1931 as the one when the

---

[10] We espoused the same interpretation of the words "negotiated or effected" when we adopted the opinion of the Dauphin County Court in affirming *Commonwealth v. The Minds Coal Mining Corp.*, 60 Pa. D. & C. 149, 153 (C.P. Dauphin County 1946) (Commonwealth docket), aff'd per curiam, 360 Pa. 7, 60 A.2d 14 (1948) ; see *Commonwealth v. Quaker Oats Co.*, 350 Pa. 253, 38 A.2d 325 (1944), appeal dismissed, 324 U.S. 827, 65 S. Ct. 857 (1945). See also *Commonwealth v. Hellertown Mfg. Co.*, 438 Pa. 134, 149-51, 264 A.2d 382, 389-90 (1970).

1931 agreement was "negotiated or effected." We conclude that the agreement was "brought about" or "accomplished" through a process of negotiation extending over several years. Furthermore, the stipulated facts and the business reality of the circumstances surrounding Safe Harbor's genesis convince us that by 1929 at the latest all but the details of the 1931 agreement had been decided. It is hard to imagine that those who exercised control over both the Baltimore and Pennsylvania companies would create a new corporate entity if they had not mapped out in advance the essentials of the new corporation's role in the integrated Aldred System.

Thus, Safe Harbor has not established that when the 1931 agreement was "negotiated or effected," it maintained "premises for the transaction of business . . . outside of the Commonwealth." During a significant part of the period of negotiations leading to the 1931 agreement, Safe Harbor was not even a corporate entity—it had not yet been created. It is self-evident that a nonexistent corporation cannot maintain a business office outside the Commonwealth.

Because Safe Harbor has failed to prove that it maintained a business office outside the Commonwealth when the 1931 agreement was "negotiated or effected," all of its 1957 gross receipts are allocable of Pennsylvania.

The order of the Commonwealth Court is affirmed.

Mr. Justice NIX concurs in the result.

––––––

DISSENTING OPINION BY MR. JUSTICE EAGEN:

The majority opinion is in conflict with our decision in *Commonwealth v. Hellertown Mfg. Co.*, 438 Pa. 134, 264 A.2d 382 (1970).

I dissent.

Mr. Chief Justice JONES joins in this dissenting opinion.